**INTELUS CORPORATION, Plaintiff,**

v.

**Bernard H. BARTON, and MedPlus, Inc., Defendants.**

**Civil Action No. AW–98–1522.**

United States District Court,
D. Maryland.

June 4, 1998.

Thomas E. Reinert, Jr., and Margaret S. Izzo, Washington, DC, for Plaintiff.

Michael S. Glassman and René M. Fix, Cincinnati, OH and Russell H. Gardner, Baltimore, MD, for Defendants.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

On May 13, 1998 Plaintiff filed a complaint, a motion for a temporary restraining order ("TRO"), and a motion for a preliminary injunction. The Court conducted a conference call with counsel on May 15, 1998, and scheduled a hearing for May 22, 1998 on the two motions for injunctive relief. The issues were fully briefed, and a hearing was held in open court on May 22, 1998. At the conclusion of the hearing the Court ruled orally, summarizing its findings and instructing that it would deny the motion for a TRO but would grant the motion for a preliminary injunction. The Court ordered that the individual defendant be enjoined from working for the corporate defendant, MedPlus, Inc., until October 14, 1998, and that the order would be effective beginning May 22, 1998 at 5:00 PM. The Court informed the parties that it would issue this memorandum opinion and written order, supplementing and further explaining the oral ruling.

### Factual Background [1]

The Plaintiff, Intelus Corp. ("Intelus") is incorporated under the laws of Delaware,

---

1. Much of this factual background was taken from the complaint, supplemented by informa-

with its principal place of business being Rockville, Maryland. Intelus engages in the business of developing, selling, and supporting software products for health care organizations. One of its primary software packages, the SunGard 2000 product suite, allows health care organizations to process patient, clinical, and financial information. At the May 22 hearing, counsel for Intelus explained that the software is particularly useful for incorporating visual images with patient charts and organizing the information in a usable format. The corporate defendant, MedPlus, Inc. ("MedPlus"), is incorporated under the laws of Ohio and its principal place of business is Cincinnati, Ohio. MedPlus also sells electronic patient record systems to health care organizations, and directly competes with Intelus in this market.

The individual defendant, Bernard H. Barton ("Barton"), began working for Intelus as an account manager in August, 1993. Barton generally worked out of his home in Michigan, but occasionally worked at the Intelus office in Maryland. As an account manager, Barton contacted and worked directly with potential and existing Intelus clients and was primarily responsible for the central and midwest regions of the country, an area covering approximately twelve states.

Barton became one of Intelus's most profitable account managers. In 1995 Barton also became a product specialist. As a product specialist, Barton conducted product demonstrations for customers. Barton also played a role in developing one of Intelus's software systems, a role somewhat unusual for account managers.

Barton signed a confidentiality agreement when he was hired by Intelus. In this agreement he pledged not to reveal certain of Intelus's confidential information, and also agreed not to compete with Intelus if and when his employment should end. The scope of this covenant is in dispute and is discussed below. The relevant sections of the agreement read as follows:

1. *Confidential Information and Materials.* As used in this Agreement, the term "confidential information and materials" refers to all information belonging to, used by, or in the possession of INTELUS or its customers relating to: business strategies, pricing, customers, technology, programs, costs, employee compensation, marketing plans, developmental plans, computer programs, computer systems, inventions, developments, and trade secrets of every kind and character.

. . .

3. *Nondisclosure and Nonuse.* Bernard H. Barton agrees that he will not, either during or after his employment with IN-TELUS, disclose any confidential information or materials of INTELUS, to any person or entity for any reason or purpose, unless INTELUS shall have given its written consent to such disclosure. Bernard H. Barton further agrees that he shall not use in any manner other than for and in the course of his furtherance of INTE-LUS's business, any confidential information or materials of INTELUS, unless IN-TELUS shall have given its prior written consent to such use.

. . .

7. *Non–Competition and Non–Solicitation.*

(a) Bernard H. Barton agrees that for a period of six (6) months following the termination of his employment, for whatever reason such termination may occur, he will not, directly or indirectly, for himself, or on behalf of any other person or firm, engage in any business, or accept compensation in any form for services, where such business or services compete directly for the customers and accounts of INTELUS.

(b) Bernard H. Barton further agrees that for the period of six (6) months, following the termination of his employment, for whatever reason such termination may occur, he will not call upon or cause to be called upon, or solicit or assist in the solicitation of any person, firm, government entity, or corporate entity listed as a customer or account of INTELUS on the date of the termination of his employment, for the

---

tion revealed at the hearing. The defendants have not yet filed answers, and the Court acknowledges that they may dispute some of these facts. Based on the arguments of the parties at the hearing, the Court believes that most of the information in this section is undisputed.

purpose of selling, renting, or supplying any product competitive with the products of INTELUS.

(c) Bernard H. Barton further agrees that for the period of six (6) months following the termination of his employment for whatever reason such termination may occur, he will not employ or on behalf of any other person or entity seek to employ any person who is employed by INTELUS.

Paragraph ten of the agreement indicates that the agreement should be construed and enforced in accordance with the laws of Maryland.

On April 14, 1998, Barton resigned from Intelus. According to Barton, this was preceded by a poor evaluation from his supervisor, a request by Barton to work less hours, an indication from Intelus that if he worked less hours he would have to accept less compensation, and a statement from Ken Adams, the Intelus CEO, that Barton's final option was to find another job. Shortly after his resignation, Barton accepted employment with MedPlus. On April 20, MedPlus issued a press release announcing that Barton had joined the company as director of corporate accounts for ChartMaxx Enterprise-wide Patient Record Systems. According to the two defendants, Barton's work for MedPlus has been limited to servicing clients already under contract with MedPlus. Further, they state that Barton individually has undertaken no activities that could be construed as directly competing for Intelus clients.

Shortly after Barton resigned from Intelus, an employee of MedPlus allegedly contacted John Ingman. Ingman was employed by Allina Health Systems, Inc., which was an Intelus client. The MedPlus employee allegedly informed Ingman that Barton had joined MedPlus, and that Allina therefore should look at MedPlus's products. Barton states that in the first week of May he learned that this phone call may have occurred, and as a result called his former supervisor, Jerry Simmons, to tell Simmons that Barton had nothing to do with the phone call to Ingman. According to Simmons, Barton also said that he told MedPlus not to call Ingman, Rick Corn, and Meg McGill right away. According to Simmons, Corn and McGill are contacts for two other Intelus clients.

Counsel for Intelus and MedPlus exchanged letters over the scope of Barton's covenant not to compete. Shortly thereafter this suit was filed.

### Analysis

#### I. Temporary Restraining Order

█ Temporary restraining orders are generally available when a party might suffer irreparable harm before a hearing on a motion for a preliminary injunction can be held. *See* Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2951 (1995). "The order is designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction . . . ." *Id.* A restraining order issued after notice and an adversarial proceeding may be treated as a preliminary injunction. *See id.*

Here, both parties received notice via the conference call on May 15. The defendants were able to retain able counsel, and all parties have submitted lengthy and substantial legal briefs. For that reason, the Court denied the motion for a TRO and only considered the motion for a preliminary injunction.

#### II. Standards for Injunctive Relief

█ A preliminary injunction is an extraordinary remedy that only should be issued when the Plaintiff clearly establishes its entitlement to such relief. *See Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir.1997). The standards for injunctive relief in the Fourth Circuit are well known. In *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manuf. Co., Inc.*, 550 F.2d 189 (4th Cir.1977), the Fourth Circuit explained that the most important factors a district court must consider in deciding whether to grant injunctive relief are the threat of irreparable harm to the plaintiff should the Court not issue an injunction, and the likely harm to the defendant if an injunction is ordered. *See id.* at 196. The district court's first task is to balance these two factors. *See Manning*, 119 F.3d at 263. After doing this balancing, the

court may then consider the third factor, which is the plaintiff's likelihood of success. *See id.* As the balance of harm moves in favor the defendant, the plaintiff has a greater burden in showing its likelihood of success. *See id.* Finally, the Court considers the fourth factor, the public interest. *See id.*

### III. *Balance of Hardships*

The Plaintiff has articulated facts showing that it would suffer irreparable harm in the absence of injunctive relief. The Maryland Court of Appeals has recognized that employers have a interest in preventing an employee from using his contacts with clients to recruit those clients after his employment has ended. *See Holloway v. Faw, Casson & Co.,* 319 Md. 324, 335, 572 A.2d 510, 515 (Md.1990). This interest is strongest for businesses in which the personal contacts between the employee and the customer are an important element determining the business's success. *See Millward v. Gerstung Int'l Sport Educ., Inc.,* 268 Md. 483, 488–89, 302 A.2d 14, 17 (Md.1973) (quoting *Becker v. Bailey,* 268 Md. 93, 97–98, 299 A.2d 835, 838 (Md.1973)). The Courts distinguish between an employer's right to protect the good will developed by a paid employee from the right of a talented employee to become a more efficient competitor because of his experience and knowledge. *See Holloway,* 319 Md. at 335, 572 A.2d at 515 (quoting *Silver v. Goldberger,* 231 Md. 1, 7, 188 A.2d 155, 158 (Md.1963)). While the employer is justified in imposing reasonable restrictive covenants to protect its good will, a restraint is not justified if the only harm suffered is increased competition. *See id.*

Plaintiff has shown that the success of its business is largely dependent on the personal contacts of its account managers, and Maryland law recognizes Intelus's right to protect itself from the harm that would result should Intelus clients choose to follow Barton and engage another software provider. Through his direct client contact, Barton had the opportunity to establish close working relationships with Intelus clients and surely played a major role in developing good will on behalf of Intelus. The press release issued by MedPlus and the alleged phone call made to the Intelus client demonstrates the harm that Intelus could reasonably expect to suffer, in the form of lost clients and loss of good will, should the Court refuse to issue an injunction.

Turning to Defendants' harm, Barton would suffer genuine harm from the issuance of an injunction. An injunction barring Barton from working for MedPlus for the period established in the contract would require him to find another employer, find temporary work until the restriction expired, or "sit on the sideline," unemployed for the duration of the restriction. The Court understands that an order forcing a person to switch, or delay employment is a serious matter.

At the hearing the Court asked counsel about Barton's ability to acquire other employment. Barton is well-educated and obviously knowledgeable in the area of computer software and sales. Counsel for Intelus informed the Court that there are at least a hundred companies that sell computer software to the health care industry, and that there are only ten or so companies which compete directly with Intelus. Although the Court does not have enough information before it to make a precise determination as to the size of this market, counsel for Defendants did not dispute that there are many other companies selling health care software for whom Barton could seek employment. Instead, counsel argued that while Barton could obtain other employment, it could take a while and would not be accomplished "overnight."

The Court agrees with counsel that Barton may not be able to obtain another position overnight, and that he would suffer some harm in having to seek alternative employment. However, it seems clear that there are many other companies in similar markets for whom Barton could work without calling into question the terms of his agreement not to compete.[2] There was also some discussion about the sizeable signing bonus and salary

---

**2.** As discussed in Section IV, the agreement only prohibits Barton from working for Intelus's direct competitors.

Barton obtained from MedPlus. While the Court does not know the effect that its ruling might have on Barton's contract with MedPlus, there was no assertion at the hearing that Barton had insufficient funds to survive without his MedPlus employment.

To conclude, both parties have demonstrated the harm that could result should the Court rule against them. However, while Intelus has demonstrated a likely, substantial harm well-recognized by Maryland law, Barton was unable to demonstrate that he would suffer more than the usual stress and economic inconvenience that accompanies a change in employment. While the Court does not underestimate the reality of this harm, it concludes that in light of the discussion about Barton's ability to find other employment, the balance of hardships favors the Plaintiff.

## IV. *Likelihood of Success*

The issue receiving the most attention concerning the Plaintiff's likelihood of success is the proper interpretation of the covenant not to compete. While the Court need not make a final determination as to the contract's meaning, the Court must consider the reasonableness of the interpretations offered by each party to determine the Plaintiff's likelihood of success.

The specific clause at issue reads as follows:

> (a) Bernard H. Barton agrees that for a period of six (6) months following the termination of his employment, for whatever reason such termination may occur, he will not, directly or indirectly, for himself, or on behalf of any other person or firm, engage in any business, or accept compensation in any form for services, where such business or services compete directly for the customers and accounts of INTELUS.

The parties offer contrasting interpretations of this clause. Defendants focus on the ending words "where such business or services compete directly for the customers and accounts of INTELUS." Defendant argues that this phrase limits the clause, and that Barton is only prohibited from personally competing for customers that Intelus has under contract. Defendants assert that Barton has only serviced clients that MedPlus already had under contract, thereby complying with the language of the covenant. MedPlus argues that Barton is in compliance as long as he personally does not compete for Intelus clients, even if he is employed by a company that is an Intelus competitor.

Intelus argues that the clause must be read more broadly, and that Barton is prohibited from working for any company that directly competes with Intelus. Intelus focuses on the phrase "engage in any business," which it believes modifies the phrase "where such business or services compete directly." Intelus takes the inclusion of many broad phrases, such as "directly or indirectly," and "for himself, or on behalf of any other person or firm," and "accept compensation in any form," as indicating that the phrase "engage in any business" must include working for a software company. Intelus reads the words "engage in any business ... where such business ... compete[s] directly for the customers and accounts of Intelus" as meaning that Barton may not work for any company that competes for Intelus customers.

The focal point of the dispute is the meaning of "engage in any business." A common sense understanding of the phrase "engage in business" includes more than the personal competitive actions taken by Barton, and the Court is inclined to read "engage in any business" as including the act of being employed by a company. Webster's first definition of the word "engage" is to mortgage, pawn, or pledge. Webster's New Int'l Dict. (3d ed.1961). The second definition is "to involve or entangle (as a person) in some affair or enterprise." *Id.* The fourth definition is "to provide occupation for" or "to arrange to obtain the services of." These definitions suggest that the common use of the word "engage" includes the act of getting involved in a company or business, such as by accepting employment with that company. Reading the phrase within the context of the entire subsection (a), the Court believes that the most reasonable reading of the subsection is that it prevents Barton from getting involved in any business, either directly or indirectly, that competes for Intelus clients.

This interpretation is supported by the broad language of the clause: Barton agreed not to "engage in *any* business," either "directly or *indirectly*," either for himself or "on behalf of *any other person or firm* " (emphasis added). When Barton accepted employment with MedPlus, he engaged in a business that directly competes with Intelus, even if he did not personally solicit Intelus customers. The Court believes that it is likely that this behavior is prohibited by the covenant.[3]

▮ The second issue relating to Plaintiff's likelihood of success is whether the contract is enforceable if Plaintiff's interpretation of the covenant is accepted. The test used for a restrictive covenant in an employment contract is "whether the particular restraint is reasonable on the specific facts." *Ruhl v. F.A. Bartlett Tree Expert Co.*, 245 Md. 118, 123, 225 A.2d 288, 291 (Md.1967). A covenant not to compete is enforceable if its duration and geographic area are only so broad as is reasonably necessary to protect the employer's business, and if the covenant does not impose undue hardships on the employee or the public. *See Holloway*, 319 Md. at 334, 572 A.2d at 515 (quoting *Ruhl*, 245 Md. at 123–24, 225 A.2d at 291).

As discussed in Section III, Intelus has an interest in preventing a loss of clients and good will, and a covenant limiting Barton's ability to take advantage of his relationships with Intelus clients may be used to protect that interest. The duration of the restriction is only six months, and neither party argued that the duration is a basis for invalidating the agreement. Instead, the parties focused on the lack of a geographic restriction.

The agreement does not contain a geographic limitation, and Defendant argues that it is therefore unenforceable. The Court has not found any Maryland caselaw specifically addressing the viability of a restrictive covenant not containing a geographic limitation. Defendant relies on Illinois caselaw in arguing that restrictions without geographic limitations are disfavored and, in this case, unenforceable. However, the case principally relied upon by Defendant instructs that Illinois has abandoned the rule that a covenant lacking a geographic limitation is *per se* unenforceable. *See Telxon Corp. v. Hoffman*, 720 F.Supp. 657, 663 (N.D.Ill.1989). Instead, Illinois courts apply a "rule of reason" and examine whether the restriction at issue is "reasonably related to the former employer's interest in protecting its customer relations." *Id.*

In the absence of specific instruction from the Maryland courts as to geographic limitations, the Court is guided by the direction that "the test is whether the particular restraint is reasonable on the specific facts." *See Ruhl*, 245 Md. at 123, 225 A.2d at 291. *See also Tawney v. Mut. Sys. of Maryland*, 186 Md. 508, 47 A.2d 372 (Md.1946) (finding covenant unenforceable because it was not necessary to prevent employees of small loan company from subsequently working for any company in Baltimore that competed directly or indirectly with the loan company). This method is consistent with the analysis in *Hekimian Labs., Inc. v. Domain Sys., Inc.*, 664 F.Supp. 493 (S.D.Fla.1987), a case in which a district court applying Maryland law issued an injunction enforcing a restrictive covenant that did not contain a geographic limitation. The court found the restriction reasonable because of the global and specific nature of the market in question. *See id.* at 498.

The discussion at the hearing indicated that Intelus competes for clients on a national, if not global basis. Competition unlimited by geography can be expected where the nature of the business concerns computer software and the ability to process information. Intelus has representatives located throughout the country, and the Defendants did not argue that Intelus and MedPlus are not national businesses. Because of the broad nature of the market in which Intelus

---

**3.** Plaintiff also notes that if subsection (a) only prohibits Barton from personally competing for existing Intelus customers, then it practically renders subsection (b) superfluous. Subsection (b) prohibits Barton from soliciting or aiding in the solicitation of any Intelus clients. While this is a strong argument, the Court notes that the Plaintiff's interpretation of subsection (a) might have the same effect. Assuming subsection (a) forbids Barton from doing anything that competes with Intelus, including accepting employment with a competitor, then surely the acts targeted in subsection (b) would be included in the acts prohibited by subsection (a).

operates, a restrictive covenant limited to a narrow geographic area would render the restriction meaningless. *See Hekimian Labs.*, 664 F.Supp. at 498.

The last phrase in subsection (a) of the covenant limits the restriction to those businesses that "compete directly for the customers and accounts of Intelus." This last phrase narrowly tailors the covenant to only restrict Barton from competing directly with Intelus, such as by working for one of Intelus's few direct competitors. Intelus has a protectable interest in preventing a loss of good will, and such a loss could easily result from Barton's employment with a direct competitor. The loss could occur even if the competitor is located somewhere other than where Intelus is located or where Barton was based, as is evidenced by the allegations of the phone call to a Intelus client. A covenant preventing Barton from working for a direct competitor is reasonably related to Intelus's interest in protecting a loss of business and of good will, regardless of where Barton performs the work for the competitor.

For a similar reason the Court also concludes that the lack of a geographic limitation does not impose undue hardship on Barton. The Court looks to Maryland cases to determine what is undue hardship. For example, in *Ruhl*, 245 Md. 118, 225 A.2d 288, the Court of Appeals forbade a "tree doctor" with only a high school education from working in the business anywhere on the eastern shore of Maryland. The tree business was the only means of livelihood in which the Plaintiff had ever worked, yet the Court found that his former employer's interests outweighed the hardship Plaintiff would suffer under the injunction.

Plaintiff's counsel represented to the Court that there are many companies providing computer software to the health care industry who do not directly compete with Intelus. Defendants did not contest this assertion, even when directly asked by the Court whether there were similar companies not in this specific market "niche." This covenant

is narrowly tailored and only restricts Barton from working for those few companies that directly compete with Intelus, which is not an undue hardship.

Upon consideration of the nature of the industry and the national and perhaps global nature of the competition, the Court concludes that the restriction is reasonably related and limited to Intelus's need to protect its good will and client base. Moreover, because of the apparent ability of Barton to find similar work, the Court also concludes that the restriction does not impose any undue hardship on the Defendants.[4]

## V. *The Public Interest*

The final factor in considering injunctive relief is the public interest. The Court is persuaded by Plaintiff's argument that the public has an interest in the enforcement of reasonable restrictive covenants. Restrictive covenants can play an important role in the growth of a business that depends upon the development of good will through effective customer service. *See Ruhl*, 245 Md. at 127, 225 A.2d at 293 (citing prior decisions and discussing importance to economic system of protecting proprietary interests of businesses). The Court anticipates that restrictive covenants will grow in importance with the continued emergence of technology driven and information based industry. An employee who can use a computer and a modem to solicit and service customers anywhere in the world is an employee who can easily jump from competitor to competitor, potentially taking with him a collection of clients. As long as employers do not restrict employees from earning a living and do not limit fair competition, they must be given the opportunity to provide a service to their customers without risking a substantial loss of business and good will every time an employee decides to switch employment.

## VI. *Unclean Hands*

█ The Defendants argued that Intelus is not entitled to equitable relief because it has appeared before the Court with "unclean

---

4. This analysis has followed the briefs and oral arguments in concentrating on the possible undue hardship imposed on Barton. The Court

does not believe that MedPlus would suffer undue hardship if it is prohibited from obtaining Barton's services for a period of six months.

hands." Defendants argued that Barton's supervisor at Intelus misappropriated the proprietary information of his former employer when he began working for Intelus, and also argued that Intelus owes Barton one hundred thousand dollars in unpaid commissions. As discussed at the hearing, the Court sees no reason to deny Intelus injunctive relief because of the alleged acts of a single employee, especially when said acts are unrelated to the events at issue in this case. As for the issue of the commissions, Intelus contends that Barton was not entitled to these commissions at the time he resigned. The Court has not been adequately informed of the relevant facts surrounding these commissions, and will not deny relief on that basis.

## VII. *Disclosure of Confidential Information*

The Plaintiffs also sought injunctive relief on the basis of Barton's alleged disclosures of Intelus's confidential information in violation of sections (1) and (3) of the agreement. Besides the admissions Barton may have made during his phone conversation with Jerry Simmons, it is entirely unclear what confidential information Barton may have had and what he did with it after his employment ended. Counsel for Defendant admitted that certain information added to the Intelus' customer list is confidential, but vigorously argued that Barton had done nothing improper with this information. The Court fully believes that an injunction barring Barton's employment with any direct competitor will prevent any disclosure of confidential information, and the order will include a provision instructing Barton to comply with this provision of the agreement.

### Conclusion

Having considered the *Blackwelder* factors and having concluded first that Plaintiff's risk of irreparable harm outweighs the harm to the Defendants, and having decided that Plaintiff demonstrated a substantial likelihood of success, and after considering the public's interest in the enforcement of reasonable restrictive covenants, the Court grants Plaintiff's motion for a preliminary injunction. Barton will be enjoined from be-

ing employed by MedPlus or any other company that directly competes with Intelus until October 14, 1998, which is six months from the date of the termination of his employment with Intelus. As discussed at the hearing, Intelus has agreed to post a bond in the amount of fifty thousand dollars, and will be instructed to do so by the order. The order consistent with this memorandum opinion will follow.

### ORDER

Pursuant to both the oral order issued in open court on May 22, 1998 and the memorandum opinion, it is this 3rd day of June, 1998, hereby ORDERED:

1. That the Plaintiff's motion for a temporary restraining order [2–1] BE, and the same hereby IS, DENIED;

2. That the Plaintiff's motion for a preliminary injunction [3–1] BE, and the same hereby IS, GRANTED;

3. That until October 14, 1998 the Defendant Bernard H. Barton shall not personally compete, directly or indirectly, for the customers and accounts of Intelus;

4. That until October 14, 1998 the Defendant Bernard H. Barton shall not accept employment or compensation from any business and/or service, including MedPlus, Inc., that directly competes for the customers and accounts of Intelus;

5. That the Defendant MedPlus, Inc. shall not employ or compensate Bernard H. Barton until October 14, 1998;

6. That the Defendant Bernard H. Barton shall not disclose any confidential information or materials of Intelus in violation of the confidentiality agreement dated August 2, 1993;

7. That the Defendant Bernard H. Barton also shall comply with sections 7(b) and 7(c) of the confidentiality agreement dated August 2, 1993;

8. That the Plaintiff, if it has not already done so, shall post a bond in the amount of fifty thousand dollars ($50,000.00);

9. That this order is effective beginning May 22, 1998 at 5:00 PM, and

10. That the Clerk of the Court shall mail copies of this order and memorandum opinion to all counsel of record.