**PADCO ADVISORS, INC.**

v.

**Jeffrey M. OMDAHL.**

**No. CIV.A.DKC 2000–2126.**

United States District Court, D. Maryland.

Jan. 11, 2002.

Jonathan C. Fritts, Donald Lawrence Havermann, Morgan, Lewis and Bockius LLP, Washington, DC, Jeff E. Lowinger,

Furey, Doolan and Abell, Chevy Chase, MD, for Plaintiff.

Eric B. Yarvin, Law Office, Bethesda, MD, Lester B. Seidel, Seidel, Yarvin & Mervis, LLC, Bethesda, MD, Joseph E. Schuler, Paul J. Kennedy, Maria Ann Perugini, Littler Mendelson, PC, Washington, DC, for Defendant.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Plaintiff PADCO Advisors, Inc. filed this diversity action for breach of contract and violation of the Maryland Uniform Trade Secret Act ("MUTSA") against Defendant Jeffrey M. Omdahl after he was employed by ProFund Advisors. Presently pending and ready for resolution are cross motions for summary judgment. Both parties have also filed unopposed motions to seal exhibits related to those motions and their replies. For the following reasons, each of the motions will be GRANTED in part and DENIED in part. The parties' respective motions to seal their exhibits will be GRANTED.

### I. *Background*

Jeffrey M. Omdahl was hired by PADCO as Vice President/Western Regional Sales Manager in August, 1996. Omdahl was responsible for marketing Rydex mutual funds to existing and potential customers in the western United States. In the Spring of 1997, former PADCO employees left PADCO and formed two competing mutual fund companies on their own. In response to the formation of two directly competing firms, PADCO drafted a Confidential Information Agreement ("CIA") containing a covenant not to compete, a non-disclosure covenant, and a non-solicitation covenant. The first draft of this agreement was abandoned because employees, including Omdahl, complained that it was too restrictive. A second version was drafted which Omdahl signed in November 1997. Paper No. 2, Ex. A. Omdahl believed that if he refused to sign the CIA his employment would be terminated. As consideration for signing the CIA, Omdahl received life insurance, accidental death and dismemberment insurance, and long term disability insurance.

The words of the CIA are not in dispute. The parties dispute, however, whether the covenant not to compete restricting future employment to companies that only directly compete with leveraged index funds and inverse-correlation funds also limits employment with their sector funds, such as the ones Omdahl works with at ProFund. In November 1997, only three mutual fund families in the United States offered leveraged index funds and inverse-correlation funds: Rydex funds, which are marketed by PADCO, and ProFund Advisors and Potomac Funds, the two companies started by former PADCO employees. This situation continues today. The parties agree that leveraged index funds and inverse-correlation funds are unique investment products that directly compete with each other and that only these three companies market these funds.

Omdahl was notified of his termination from PADCO on November 1, 1999 by Mark Bentley after a negative performance evaluation. On November 30, 1999 Omdahl's employment at PADCO ended pursuant to a resignation agreement signed by Omdahl. During the month of November, a PADCO representative cleaned out Omdahl's office, removing PADCO files and shipping them back to company headquarters in Maryland. Paper No. 69, Ex. 5, Viragh Dep. at pp. 130–32. Omdahl asserts that PADCO terminated him and threatened to withhold certain commissions if Omdahl did not comply fully with PADCO's demands. *Id.*, Ex. 4.

PADCO replies that Omdahl's Resignation Agreement was negotiated with the assistance of counsel. Nothing in the agreement, however, indicates that it was negotiated and the counsel mentioned in the agreement is Mark Bentley, who was a PADCO employee, not Omdahl's counsel. Paper No. 67, Ex. W at p. 82–3. Neither party disputes that Omdahl was reminded of his obligations under the CIA by Mark Bentley and in the text of the Resignation Agreement at the time of his termination with PADCO.

After Omdahl learned that his employment would be terminated, he contacted ProFund, a direct competitor in the field of leveraged index funds and inverse-correlation funds. He also contacted other mutual fund companies in order to seek employment. Shortly after his termination from PADCO, Omdahl accepted a position with Sun America in March 2000, but was only employed for six days. According to Omdahl, Sun America wanted him to move from Santa Barbara, California, which was not possible due to his family obligations so, therefore, he was not able to continue his employment.

In March 2000, following his brief employment with Sun America, Omdahl accepted the position of National Vice President/Sectors with ProFund Advisors. Prior to accepting this position, Omdahl had at least one conversation with ProFund's CEO, Michael Sapir, about the CIA Omdahl signed with PADCO and the possibility that PADCO would sue to enforce it. Paper No. 67, Ex. W at p. 125–28. Omdahl did not notify PADCO that he was accepting employment with ProFund, which is in violation of Section 3(d) of the CIA. Omdahl states that his position at ProFund was created for him to assist in the ongoing development and launch of the UltraSector ProFund, ProFund's new sector funds. On April 17, 2000, ProFund issued a press release announcing Omdahl as its new National Vice President/Sectors. On June 13, 2000, PADCO filed a complaint in the Circuit Court for Montgomery County, Maryland alleging breach of the non-disclosure/non-solicitation agreement and covenant not to compete and misappropriation of trade secrets under MUTSA, by Omdahl's continuing use of the knowledge contained within PADCO's customer database. A Temporary Restraining Order was entered against Omdahl contacting PADCO customers on June 21, 2000 and was set to expire on July 25, 2000. Omdahl was not restricted from working for ProFund during that time. Omdahl removed this action from the Circuit Court for Montgomery County to this court on July 14, 2000. On July 26, 2000, this court extended the Temporary Restraining Order imposed by the Circuit Court until the conclusion of the preliminary injunction hearing. On December 1, 2000, this court entered a preliminary injunction enjoining Omdahl from disclosing to any third party, including ProFund Advisors, the name, address, or any other information about customers of PADCO, from participating in any communication within ProFund concerning any particular customer of ProFund or PADCO, from having his name associated with ProFund in any public way, but it did not preclude him from remaining employed by ProFund and from certain specified communications and business activities. Paper No. 53. That injunction is still in effect today.

As a Vice President with ProFund Advisors, Omdahl has met with twenty or more PADCO customers whom he knew during his employment with PADCO and has spoken at length with them about ProFund's mutual funds. While employed at PADCO, Omdahl used PADCO's protected customer database on a regular basis and became so familiar with the customers list-

ed that he did not need to refer to the database to recall their information.

PADCO's customer database was compiled through conversations between PADCO's sales representatives and individual registered investment advisors ("RIAs"). Each RIA's profile contains his investment strategy, total assets he manages, where the assets are invested, and the type of portfolio management software used. This database is considered by PADCO to be a trade secret. Access to the database is limited to a need-only basis among PADCO employees, so that fewer than 15% of PADCO employees can access this information and it is specifically designated as confidential information by the CIA, which prohibits Omdahl from using or disclosing information in the database without PADCO's consent. Additionally, Omdahl is prohibited from soliciting or calling any customer who was in the database when his employment ended for a period of two years following the end of his employment, regardless of where he is employed.

## II. *Standard of Review*

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *see also Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987); *Morrison v. Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir.1979); *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir.1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Pulliam Inv. Co.,* 810 F.2d at 1286 (citing *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gill v. Rollins Protective Servs. Co.,* 773 F.2d 592, 595 (4th Cir.1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

In *Celotex Corp.,* the Supreme Court stated:

In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "spe-

cific facts showing that there is a genuine issue for trial."

*Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. However, " 'a mere scintilla of evidence is not enough to create a fact issue.' " *Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir.1984) (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C.1966), *aff'd*, 388 F.2d 987 (4th Cir.1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## III. *Analysis*

### A. **Choice of Law**

■ In diversity actions, the choice of law rules of the state in which the district court sits determine the applicable substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). When deciding contract claims, Maryland applies the doctrine of *lex loci contractus, Allstate Insurance Co. v. Hart*, 327 Md. 526, 611 A.2d 100, 101 (1992), meaning that the law of the place where the last act was performed to complete the contract applies. *Sting Security, Inc. v. First Mercury Syndicate, Inc.*, 791 F.Supp. 555, 558 (D.Md.1992). Maryland courts also apply the choice of law standard in the Restatement (Second) of Conflict of Laws § 187(2) (1971) which states:

The law of the state chosen by the parties to govern their contractual rights will be applied, . . . unless either

(a) the chosen state has no substantial relationship to the parties or transaction and there is no reasonable basis for the parties choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties.

It is undisputed that the contract includes a choice of law clause designating Maryland as the applicable law. This court applied Maryland law to this claim when imposing the preliminary injunction upon Omdahl based on the choice of law clause in the agreement, the fact that Maryland is where the last act necessary to form the contract occurred since Omdahl's CIA was signed in Maryland, and it is the home of the Plaintiff. Defendant continues to urge, however, the application of California law, based on the fact that Omdahl resides in California and it is allegedly against California's public policy to honor covenants not to compete. Defendant has misstated California's law by flatly asserting that all covenants not to compete are prohibited by § 16600 of California's Professional and Business Code.

Courts applying § 16600 in California have recognized an exception to the bar on covenants not to compete when "necessary to protect the employer's trade secrets." *Application Group, Inc. v. Hunter Group, Inc.*, 61 Cal.App.4th 881, 900, 72 Cal. Rptr.2d 73 (1998). In that case, the court decided to apply Maryland law, which honors covenants not to compete, rather than California law, concluding that, as here, "the real issues for decision are whether Maryland's law is contrary to a *fundamental* policy of California and, if so, which state has a 'materially greater interest' in the determination of the issue." *Id.* Because California has recognized an exception to covenants not to compete in order to protect trade secrets and PADCO is alleging that the CIA was drafted with the

express purpose of protecting their database which they characterize as a trade secret, Maryland's law is clearly not contrary to a fundamental policy of California. Therefore, there is no compelling reason to ignore the choice of law clause agreed to by the parties and Maryland law will be applied.

### B. Breach of Contract Claim

PADCO asserts that Omdahl breached the contract formed by the CIA by violating the covenant not to compete when he became employed with one of PADCO's primary targeted competitors, ProFund Advisors. PADCO asserts that the CIA was specifically drafted with ProFund Advisors in mind because it was drafted shortly after ProFund was formed and only prohibits employment with funds who directly compete with PADCO's "unique investment products". ProFund markets leveraged index funds and inverse correlation funds very similar to PADCO's. Therefore Omdahl's employment by Pro-Fund is a breach of his agreement to not to compete.

Omdahl does not dispute that the covenant was aimed at prohibiting future employment with ProFund Advisors or Potomac, but asserts that the agreement is not reasonable in scope, is not necessary to protect PADCO's business, imposes an undue hardship on Omdahl, and disregards the public interest. Omdahl urges this court to find that the CIA is illegal and grant summary judgment in his favor.

#### 1. Reasonable in Scope

■ Both parties agree that Maryland courts have determined that:

the test is whether the particular restraint is reasonable on the specific facts. The general rule in Maryland ... [is] that "restrictive covenants in a contract of employment, will be sustained 'if

the restraint is confined within limits which are no wider as to area and duration than are reasonable for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public.' "

*Ruhl v. F.A. Bartlett Tree Expert Co.*, 245 Md. 118, 225 A.2d 288, 291 (1967). The highest court in Maryland stated in *Ruhl* that "[e]ven in the absence of trade secrets, under certain circumstances, a former employee may be enjoined from using confidential information obtained during the course of his employment." *Id.* at 293. There the court upheld a two year restriction even though no trade secrets were involved.

Omdahl urges that, in his case, a duration of two years is too long, although he does not suggest a reasonable alternative. Moreover, he became employed by Pro-Fund less than six months after termination of his employment with PADCO. A six month period is certainly reasonable if a covenant not to compete is to have any value at all. Omdahl's argument that two years is too long is also misplaced, inasmuch as Maryland has consistently upheld two year limitations on employment with competitors as reasonable. *See Gill v. Computer Equipment Corp.*, 266 Md. 170, 292 A.2d 54, 59 (1972); *Tuttle v. Riggs–Warfield–Roloson, Inc.*, 251 Md. 45, 246 A.2d 588, 589 (1968); *Ruhl*, 225 A.2d at 291. These limitations are reasonable in highly competitive industries where the employer has a legitimate interest in "endeavoring to protect the customer contacts which he had been able to develop." *Ruhl*, 225 A.2d at 292, n. 1. The limitations have been upheld in recognition of the importance of "the employee's relationship with the persons he served." *Ruhl*, 225 A.2d at 292. Here, where RIAs and other customers necessarily rely on the broker's knowl-

edge, analysis, and expertise, a two year period cannot be said to be unreasonable. In addition, Omdahl has failed to cite to a Maryland case which held a two year restriction was unreasonable. Therefore, there is no support for Omdahl's contention that a two year restriction is unreasonable.

■ Omdahl also states that the restriction is unreasonable because there is no geographic limitation. The restriction, however, is so carefully tailored that it is more reasonable than one that would limit Omdahl's employment to non-Maryland corporations. It is undisputed that the covenant not to compete was drafted to limit employment only at the two competing mutual fund companies which market the same type of funds that PADCO does, ProFund Advisors and Potomac. As *Ruhl* holds, the test is whether a covenant is reasonable on the specific facts. It is more reasonable to aim the covenant not to compete at two firms, rather than to limit employment to a geographic area, when the only real threat of competition is posed by those two specific firms. The CIA is narrowly tailored in order to meet the standards of reasonableness under Maryland law.

As Omdahl acknowledges, district courts applying Maryland law have upheld similar covenants without geographic restrictions. *See Intelus Corp. v. Barton*, 7 F.Supp.2d 635 (1998) (holding that lack of geographic limitation is permissible when it "does not impose undue hardship"). In *Intelus*, an employer sought to prevent its employee from working for one of its approximately ten competitors and tailored the agreement specifically to address that goal, as did PADCO. *See Intelus*, 7 F.Supp.2d at 641–42. PADCO's position is even more compelling because the CIA was drafted to prevent future employment with only two mutual fund companies out of the hun-

dreds that exist. Further, it is difficult to see how a geographic limitation would be appropriate when PADCO and ProFund Advisors are located in Maryland and Omdahl must live and work out of Santa Barbara, California. It would have been more restrictive for PADCO to draft the CIA to prohibit employment with mutual fund companies in Maryland. Here, PADCO has appropriately and reasonably limited the restriction only to its direct competitors.

### 2. Necessary to Protect PADCO's Business

■ The CIA must be narrowly tailored to protect PADCO's business. Omdahl claims that the Agreement is overbroad and unenforceable because he is not marketing the Unique Company Products (the two unique types of mutual funds). He argues that PADCO is attempting to protect a trade secret, the customer database, and that the agreement does not seek to prevent continuing relationships between former employees and clients. PADCO argues that both the relationships and the database are at issue and that the CIA is designed to keep former employees from competing with PADCO for its customers. To support his position, Omdahl cites a case over fifty years old for the proposition that a covenant preventing former employees from "engaging directly or indirectly in any business competitive with that of their employers" was held to be overbroad. *Tawney v. Mutual System of Maryland*, 186 Md. 508, 47 A.2d 372, 374 (1946). That language is much more general than the carefully drafted language at issue here which limits employment with only two companies out of the entire group of mutual fund companies in the United States. *Tawney* is easily distinguishable from the instant situation and is an inappropriate reference given its age and the lack of

similarity to the instant case. As PADCO asserts, the language of the agreement is clearly aimed at protecting both its database and customer relationships since Section 4 is entitled "No Solicitation or Disclosure of [PADCO's] Customers". Paper No. 1, Complaint, Ex. A ¶ 4. Omdahl argues that his work is exempt since he is working in the area of sector funds, which are not "unique investment products" as defined by the agreement. But it is undisputed that he is working for one of the only two companies that compete against PADCO in the field of these unique investment products and it would be impossible for PADCO to monitor whether he is disclosing protected information to its direct competitor. Therefore, the agreement is not overbroad.

### 3. Undue Hardship

■ Omdahl argues that the CIA poses an undue hardship by severely limiting his employment options because he is not able to relocate from Santa Barbara due to his own family needs and that area does not provide many prospects for employment with other mutual fund companies. He estimates that he will not be able to find other employment for at least six months. Omdahl provides no supports for this assertion, which is a longer estimate than the three and a half month length of his search after his termination from PADCO. While his employment with Sun America ended due to the fact that he was not able to relocate, he was hired by ProFund Advisors, a Maryland company, very shortly thereafter. Omdahl has not shown that his own family restrictions create an undue hardship. He successfully obtained employment with multiple companies not based in Santa Barbara, and Omdahl himself has estimated that he will be able to obtain employment in approximately six months. Accordingly, this limitation does not rise to the level of undue hardship that would make the covenant unreasonable.

■ While it is undisputed that the covenant not to compete only applies to two mutual fund companies, it is clear that the language of the non-solicitation clause absolutely forbids Omdahl from contacting any investor in the PADCO database for two years, no matter whom he is employed by, even if he has no idea that they are contained in the PADCO database. Paper No. 2, Ex. A, ¶ 4. Maryland has looked with disfavor on similar portions of other agreements which restrict former employees from dealing with all former clients. In *Holloway v. Faw, Casson Co.*, 78 Md.App. 205, 552 A.2d 1311, 1319 (1989), *rev'd in part on other grounds*, 319 Md. 324, 572 A.2d 510 (1990), the Maryland Court of Special Appeals held that a restriction upon a former employee from contacting *any* former clients, whether or not he had actually dealt with those clients during his former employment, was unreasonable when injunctive relief is the remedy. This prong of the CIA is similar to that restriction as it prohibits Omdahl from contacting all RIAs in the database even if he is not working for a targeted competitor. In *Holloway,* the court found that "under the facts of this particular case, the severity of the restriction against servicing *any* of the employers former clients was unjustifiable for the purpose of protecting the employer." *Id.* at 1321. The language in Section 4 of the agreement could create an undue hardship for former employees working for non-direct competitors and it would be difficult to remember exactly who made up the 4,000 RIAs in the database at the time of their dismissal. However, as Omdahl is employed by a direct competitor, this provision is not overly broad and does not need to be narrowed by this court. Therefore the agreement as it applies to Om-

dahl's employment does not pose an undue hardship.

### 4. Public Interest

■ Omdahl argues that the agreement is against the public interest, based upon this court's observation at the preliminary injunction hearing that this is a "healthy competition that is ongoing" between PADCO and ProFund Advisors which should be maintained, instead of restricted by a covenant. Paper No. 56, Preliminary Injunction Hearing Trans. at p. 40–41. Omdahl intentionally omits, however, the following sentences: "So I don't think [the competition] is affected one way or the other. I certainly didn't hear anything to indicate that if he weren't allowed to work for ProFund, that that competition would lessen in any way." *Id.* at 41. Omdahl has not presented any additional evidence that the competition between ProFund and PADCO would be lessened if he were prevented from being employed by ProFund for two years in compliance with the CIA. Therefore, there is no public interest justification for finding that this covenant is unenforceable.

### C. Maryland Uniform Trade Secrets Act Claim

PADCO alleges that Omdahl violated the Maryland Uniform Trade Secrets Act and misappropriated trade secret information, namely the PADCO database, by soliciting customers contained therein. Md. Code Ann. Com. Law I § 11–1201, *et seq.* (1989) ("MUTSA"). Omdahl disputes PADCO's assertion that the database is a trade secret and asserts that, even if it is, he has not misappropriated its contents.

### 1. Database as Trade Secret

■ PADCO must prove that the database is a trade secret in order to establish that Omdahl is in violation of the MUTSA.

Under the Code, the definition of "Trade secret" is:

... information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md.Code Ann., Comm. Law § 11–1201(e) (1989). PADCO cites numerous cases from other jurisdictions which have found customer lists to be a trade secret under similar state statutes, but only one from Maryland. *See Home Paramount Pest Control Cos. v. FMC Corp.,* 107 F.Supp.2d 684, 692 (D.Md.2000) ("There is no question that a customer list can constitute a trade secret."). While the court in *Home Paramount* found that a customer list could possibly constitute a trade secret, it held that the list in that case was not a trade secret. *Id.* at 692–93.

Maryland courts have held under the common law that a customer list can constitute a trade secret, weighing several factors:

(1) the extent to which the information is known outside of [the employer's] business; (2) the extent to which it is known by employees and others involved in [the employer's] business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and to his competitors; (5) the amount of effort or money expended by [the employer] in developing the information; (6) the ease or difficulty with which the information could be

properly acquired or duplicated by others.

*Dworkin v. Blumenthal,* 77 Md.App. 774, 551 A.2d 947, 950 (Md.1989) (citing *Space Aero Products Co. v. R.E. Darling Co.,* 238 Md. 93, 110, 208 A.2d 699 (1965)). While the "MUTSA statute preempts common law definitions of trade secrets, Maryland courts have continued to apply the Restatement of Torts six-part test as 'helpful guidance' in determining the existence of a trade secret." *Home Paramount Pest Control,* 107 F.Supp.2d at 692 (citing *Bond v. PolyCycle, Inc.* 127 Md.App. 365, 372–73, 732 A.2d 970 (Md.App.1999)).

PADCO asserts that its database meets both prongs of the MUTSA definition of "trade secret". It states that the information in the database is not generally known or readily ascertainable because, while some information is public, such as name, contact information, and investment strategy, other information is not, such as detailed information about the RIA's investment goals, what the RIA likes or dislikes about particular investment products, and what types of new products the RIA would like to see in the future. Omdahl does not refute that this information exists in the database. He responds that much of the information in the database came from the Blue Book, a public source, that detailed information is provided to industry sales conference attendees, and that other individuals in the mutual fund business have access to very detailed RIA information.

Although it is admitted on both sides that much of the information in the database is publicly available, it is also admitted that not all of the information is publicly available. According to PADCO, the process of compiling the database information is a result of employees developing close relationships with RIAs to determine how best to meet their investment strategy. The database and the Blue Book are clearly not synonymous as the database contains only a small fraction of the RIAs who are listed in the Blue Book and there is no value in creating a separate database to reenter contact information that is already available publicly.

As Omdahl points out, however, PADCO must also establish that this list would be valuable to competitors. *Home Paramount Pest Control,* 107 F.Supp.2d at 693. PADCO claims that it derives economic value from the information collected because it is able to market its funds more efficiently. Both parties agree that Pro-Fund is one of two companies that markets funds that directly compete with PADCO. Therefore ProFund would derive commercial benefit from the specific customer information contained in the database. As a result, the database derives independent economic value from not being generally known or readily ascertainable to its competitors because the information compiled therein regarding the RIAS' investment history is collected to develop new products.

Omdahl also argues that the database is not the subject of substantial efforts to protect its secrecy and therefore is not subject to trade secret protection under MUTSA. MUTSA requires efforts that are "reasonable under the circumstances to maintain its secrecy." Md.Code Ann., § 11–1201(e)(2). PADCO points out that the database is protected by "firewalls" and passwords. The strongest support for its argument that it has been kept secret is that only about 23 employees out of 160 have access to this database and everyone who is granted access is required to sign the CIA. However, whether the database is sufficiently valuable to be considered a trade secret under the definition of the MUTSA is a disputed question of fact. Therefore, this subissue is not ripe for summary judgment.

## 2. Misappropriation

■ According to PADCO, Omdahl has misappropriated the information in the database by contacting RIAs listed therein, many of whom he had contact with in his former position with PADCO. The MUT-SA defines "misappropriation" as:

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

... (ii) At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

... 2. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use ....

Md.Code Ann., Com. Law § 11–1201 (1989). Omdahl does not dispute that he has contacted these individuals, but argues that he is not "using" database information in his new employment because he is handling funds that are not in direct competition with the unique product that PADCO markets and he does not have a copy of the database information. Further, these RIAs are listed publicly so there is no way to prove that Omdahl is contacting them as a result of information gleaned from the database. Therefore, Omdahl asserts that Plaintiff cannot prove that he has misappropriated trade secrets as PADCO has no evidence that he used any of the information contained in the database to solicit these RIAs.

Omdahl is correct that PADCO has forecast no additional evidence of misappropriation of the database. PADCO asserts that it "is reasonable to predict that Omdahl would engage in further ... misappropriation if not enjoined." Paper No. 78, p. 9. Because the database contains customer names and contact information as well as specialized information, it is impossible to tell if Omdahl is using the specialized information from the database, such as customers' preferences and desires for future products, or if he is merely contacting RIAs who happen to be customers of PADCO as well. PADCO also argues that Omdahl's solicitation of its customers on behalf of ProFund constitutes misappropriation despite the fact that it has no direct evidence that he has used database information and he has not been working with the same funds he sold at PADCO.

In order to overcome the fact that it does not have any direct evidence of misappropriation, PADCO asserts that Maryland has adopted the theory of inevitable disclosure and that it would be impossible to enumerate all the secrets learned by Omdahl, therefore PADCO is entitled to a permanent injunction under the MUTSA. *See Head Ski Co. v. Kam Ski Co.,* 158 F.Supp. 919 (D.Md.1958). The doctrine of inevitable disclosure has not been expressly adopted by the Maryland state courts.

It is inappropriate to adopt the doctrine of inevitable disclosure in this case because, even if the list was a trade secret at some time, PADCO has no evidence that the list remains a viable trade secret indefinitely, particularly if Omdahl does not physically possess it. In other cases where a customer list qualified as a trade secret, the customer information was physically taken in tangible form by the former employee. *See Morlife, Inc. v. Perry,* 56 Cal.App.4th 1514, 66 Cal.Rptr.2d 731 (1997). It is undisputed that Omdahl did not take any tangible records regarding the database and any database information Omdahl retains is solely from memory. Then, it is doubtful that Omdahl will remember anything useful at this late date, more than two years after he left. The information in the database is constantly changing since customer information, such as investment strategy, is continually modified. Mark Bentley testified

at his deposition that the database had "changed substantially since Mr. Omdahl's leaving Rydex." Paper No. 69, Ex. 2, p. 66, 1. 14–15. Therefore, it is highly unlikely that Mr. Omdahl's memories of the database as it existed on the day of his termination would qualify as a trade secret subject to misappropriation many years later.

Because there is no evidence of actual misappropriation, Omdahl is not currently liable under § 11–1201 of the MUTSA. Furthermore, for any memory of this list to qualify as a trade secret into the future, Plaintiff would have to show continued value to competitors and it has not done so. Therefore, summary judgment will be granted in favor of Omdahl on the MUTSA claim.

### D. Remedies

██ PADCO requests specific performance of the CIA's covenant not to compete and the non-solicitation and non-disclosure covenants, as well as attorneys fees, court costs and damages resulting from the breach. In addition, it requests a permanent injunction enjoining Omdahl from misappropriating PADCO's trade secret information under the MUTSA, which it characterizes as the most important remedy. Omdahl responds by pointing out that PADCO has failed to prove damages, which is an element of breach of contract under Maryland law, and therefore its claim fails as a matter of law. Omdahl also states that because he has not misappropriated PADCO's database information he is not liable under the MUTSA and, therefore, the court should deny PADCO's plea for injunctive relief.

PADCO has not failed to prove damages, as Omdahl asserts. Although they are not able to quantify the amount of monetary damage they have suffered and will suffer as a result of Omdahl's breach of the CIA, this does not mean that PADCO's business interests have not been damaged by Omdahl's employment with a direct competitor. It is for this reason that courts have routinely enforced covenants not to compete, as it is nearly impossible to quantify the amount of damage caused when former employees work for direct competitors. In order to protect an employer's business interests, such as a loss of clients and good will, covenants not to compete that require specific performance are enforceable. *See Intelus*, 7 F.Supp.2d 635, 641 (D.Md.1998).

PADCO asserts that a permanent injunction is the proper relief because "the Agreement is reasonable and enforceable under Maryland law and because the enforcement of such agreements is in the public interest." Paper No. 73, p. 17. Omdahl states that a permanent injunction is not warranted because, he argues, PADCO has failed to prove damages, the CIA is unenforceable, and, even if an injunction is warranted, it has expired because it should only run for two years from date of termination, which would have ended on November 30, 2001.

The standard for an injunction in Maryland is "relief 'prohibiting someone from doing some specified act or commanding someone to undo some wrong or injury . . . [g]enerally, it is a preventive and protective remedy, *aimed at future acts,* and it is not intended to redress past wrongs.'" *Colandrea v. Wilde Lake Community Assoc.,* 361 Md. 371, 761 A.2d 899, 911 (2000) (citing *Carroll County Ethics Comm'n v. Lennon,* 119 Md.App. 49, 703 A.2d 1338, 1342–43 (1998)) (emphasis in original). A permanent injunction may be ordered if there "has been a determination on the merits of the claim." *Maryland Com'n on Human Relations v. Downey Communications, Inc.,* 110 Md.App. 493, 678 A.2d 55, 67 (Md.1996). Here the court has deter-

mined that the breach of contract claim is valid and Omdahl is liable for the breach. PADCO argues that equity demands that the covenant not to compete, the non-solicitation, and the non-disclosure agreements be extended past the date that they would have expired, November 30, 2001. PADCO states that four months should be subtracted from the twenty-four month period, as a credit for the period in which Omdahl was not in breach of the CIA, and that the remaining twenty months should start running from the time the court enters a permanent injunction.[1] Omdahl, on the other hand, contends that no permanent injunction is warranted because the agreement is unenforceable as it is overbroad and the time limit is unreasonable. Further, even if it was enforceable, the two year period from termination has passed so, therefore, the period for an injunction has already expired.

The CIA requires a two-year period of not being employed by a direct competitor following the date of termination with PADCO. Under the terms of the preliminary injunction, Omdahl has been employed in a limited capacity by ProFund, which would not be permitted under the strict language of the covenant not to compete. He has not been allowed to work with the funds that directly compete with PADCO while the CIA's language would have forbidden any employment with a direct competitor for two years. The Maryland courts have held that the aim of an injunction is to prevent future acts, and not redress past wrongs. PADCO, however, asserts that equity may permit the extension of the covenant not to compete, as the former employer may be entitled to two full years of non-competition as bargained for. Other courts have recognized that if the non-compete period is not en-

forced through equitable extension, it could "reward the breach of contract, encourage protracted litigation, and provide an incentive to dilatory tactics." *Roanoke Engineering Sales Co. v. Rosenbaum,* 223 Va. 548, 290 S.E.2d 882, 886 (1982). As the Virginia Supreme Court stated in a similar situation, "The question ... is whether he is able, by his breach of his agreement, not only to reap the profits of his breach but also to render the judicial system impotent to redress it, simply by forcing the other party to go through lengthy litigation to obtain relief." *Id.*

Maryland courts have not spoken directly to this issue. In *Nationwide Mut. Ins. Co. v. Hart,* 73 Md.App. 406, 534 A.2d 999, 1002 (1987), the Court of Special Appeals upheld the denial of an interlocutory injunction where the covenant specifically barred employment with a competitor for one year EITHER after termination of employment OR after an injunction was obtained. The court stated the covenants that go into effect at the date of employment termination are valid, but covenants that are effective at some indefinite date in the future are not. *Id.* ("Although restrictive covenants have been upheld, the covenants in those cases went into effect on the date the employment was terminated, not some indefinite date in the future ....."). The court in *Nationwide* held that the plaintiff's request for an interlocutory injunction had been rendered moot "by the passage of time since the one year period set out in the contract". *Id.*

The instant case differs because the covenant not to compete itself is fixed for two years from the time of termination and the issue before the court is issuance of a permanent, not interlocutory, injunction. The *Nationwide* case does not indicate how Maryland courts might view the equi-

---

1. Omdahl has been subject to a preliminary injunction since July 13, 2000, when a tempo-rary restraining order was entered in State court and extended by this court.

table consideration of an extension of an injunction for an additional period, once a court has decided that permanent injunctive relief is warranted. The parties have not specifically addressed this issue in their motions.

Even if Maryland law would allow an equitable extension of the non-compete past the original term, the parties have not addressed the complicating factor that Omdahl has been subject to a preliminary injunction since July 2000, albeit on terms not co-extensive with the CIA.[2] Nor has the court been able to find case law or other guidance on this issue. Arguably, because PADCO bargained for a full two years of non-employment with a direct competitor, it might be entitled to some period of such non-employment beyond the four months. On the other hand, Omdahl has been restricted in the type of employment he could perform under terms that the court felt avoided irreparable harm to PADCO. To enjoin employment altogether at this time, for any appreciable period, might impose an undue burden. In any event, the parties are directed to address the issues of (1) the availability vel non of an equitable extension of the non-compete period under the law, and (2) assuming it is available, whether such relief should be ordered and under what terms and for what period. The time for filing the memoranda will be set in the accompanying order.

### E. Motions to Seal

Both parties have filed unopposed motions under Local Rule 105.11 to seal their exhibits in connection with their respective motions for summary judgment and their oppositions. In order to place the exhibits under seal, this court must determine "that the denial [of access] serves an important governmental interest and that there is no less restrictive way to serve that governmental interest." *Rushford v. New Yorker Magazine,* 846 F.2d 249, 253 (4th Cir.1988). To make that determination, the court "must follow [certain] procedural requirements." *Id.* "Under *Knight,* a court must first give the public notice of a request to seal and a reasonable opportunity to challenge it." *Stone v. Univ. of Maryland,* 855 F.2d 178, 181 (4th Cir.1988) (citing *In re Knight Publishing Co.,* 743 F.2d 231, 235 (4th Cir.1984)). It "must notify persons present in the courtroom of the request or docket it 'reasonably in advance of deciding the issue.'" *Id.* (citing *Knight,* 743 F.2d at 235). Additionally, the court must "consider less drastic alternatives to sealing and, if it decides to seal documents, must 'state the reasons for its decision to seal . . . , and the reasons for rejecting alternatives to sealing in order to provide an adequate record for review.'" *Id.* (citing *Knight,* 743 F.2d at 235). These requirements are undertaken whether the action is at the summary judgment or trial stage. *Rosenfeld v. Montgomery County Public Schools,* 2001 WL 1658893, at *5–*7, —— F.3d —— (4th Cir. Dec. 27, 2001).

The parties' motions to seal have been docketed and available to the public since April 2001, thereby providing the requisite notice under the requirements of *Knight* and *Stone.* No objections to sealing the exhibits have been received. Both parties seek to seal their exhibits on the grounds that the exhibits contain valuable trade secrets that they have a significant interest in protecting. The court finds their assertions to be *prima facie* correct, as this action is based on enforcing a non-

---

**2.** The parties earlier sought clarification of the preliminary injunction relating to presentations on investment strategies. PADCO's position appears to be the correct one, that the original injunction prohibited the type of presentation in question.

compete clause in an employment contract in order to protect these trade secrets. The court must have access to the exhibits to resolve the pending motions and they must remain in the record. Only the exhibits themselves are under seal. Therefore, since there is no reasonable alternative to sealing the exhibits, the court grants both parties motions to seal their respective exhibits.

## IV. *Conclusion*

For the reasons stated above, summary judgment is granted in favor of PADCO on the breach of contract claim with respect to employment with direct competitors for two years following employment with PADCO. Summary judgment is granted in favor of Omdahl on the MUTSA claim. Both parties motions to seal are granted. An order will follow.

## *ORDER*

In accordance with the accompanying Memorandum Opinion, IT IS this ____ day of January, 2002, by the United States District Court for the District of Maryland, ORDERED that:

1. The Motion for Summary Judgment on the breach of contract claim by Plaintiff PADCO Advisors, Inc., BE, and the same hereby IS, GRANTED;

2. The Motion for Summary Judgment on the Maryland Uniform Trade Secrets Act by Plaintiff PADCO Advisors, Inc., BE, and the same hereby IS, DENIED;

3. The Motion for Summary Judgment on the breach of contract claim by Defendant Jeffrey M. Omdahl, BE, and the same hereby IS, DENIED;

4. The Motion for Summary Judgment on the MUTSA claim by Defendant Jeffrey M. Omdahl BE, and the same hereby IS, GRANTED;

5. The parties' respective Motions to Seal Exhibits BE, and the same hereby ARE, GRANTED;

6. Plaintiff will file, within fifteen days from the date of this order, a memorandum concerning equitable extension of the injunction and Defendant will have fifteen days to respond; and

7. The Clerk is directed to transmit a copy of the Memorandum Opinion and this Order to counsel for the parties.