### HOME PARAMOUNT PEST CONTROL COMPANIES, INC.

v.

### FMC CORPORATION/AGRICULTURAL PRODUCTS GROUP

No. Civ. L–98–2533.

United States District Court, D. Maryland.

July 13, 2000.

---

Ronald M. Cherry, Joseph M. English, (McGuire, Woods, Battle & Boothe), Baltimore, Maryland, for plaintiff.

Nathan Daniel Adler, (Neuberger, Quinn, Gielen, Rubin & Gibber), Baltimore, Maryland, Wayne A. Graver, Regina A. Jones, (Lavin, Coleman, O'Neil, Ricci, Finarelli & Gray), Philadelphia, Pennsylvania, for defendant.

## MEMORANDUM

LEGG, District Judge.

Before the Court are the defendant's Motion for Summary Judgment and Motion for Partial Summary Judgment on its Counterclaim. Because the parties have thoroughly briefed the issues, the Court will dispense with a hearing. (*See* Local Rule 105.6 (D.Md.1999)). For the following reasons, the Court shall, by separate Order, (i) GRANT in part and DENY in part the defendant's Motion for Summary Judgment, and (ii) DENY the defendant's Motion for Partial Summary Judgment on its Counterclaim.

## I. Background

Plaintiff Home Paramount is engaged in the pest control business in Maryland and Virginia. Its subsidiary York Distributors ("York") sells and distributes pest control products to pest control operators primarily in the eastern United States. Among York's clients is its parent company, Home Paramount. Defendant FMC Corporation ("FMC") manufactures and sells pest control products to distributors, including York.

York was an authorized distributor of FMC pest control products for several years, beginning at least in 1993.[1] York sold FMC products to extermination companies, including to its parent company, Home Paramount. In 1993, FMC implemented its "Alliance Points Program." Under the Program, FMC provided rebates to exterminators who purchased their products through an authorized FMC distributor such as York. This program was advantageous to Home Paramount, because for each purchase of product Home Paramount made from its subsidiary York, Home Paramount received a rebate from FMC.

As a condition for participation in the Alliance Points Program, each authorized distributor was required to provide FMC with a list of all customers who purchased FMC's products. The information included the amount and type of product purchased. In general, FMC limited access to this information. (*See* Chalk Dep. at 147). In return for the customer list, FMC paid a fee to York equal to 2% of York's yearly FMC product sales. The parties dispute whether this payment represented the actual purchase of the list by FMC or was instead simply a reimbursement for York's administrative costs in compiling the list.

FMC and York entered into yearly distributor agreements. (*See, e.g.,* Def. Mot.Sum.J. Ex. B.) As part of the distributorship agreement, York received "core distributor rebates" from FMC based on the amount of York's annual purchases.

In 1995, FMC began a policy of encouraging distributors to purchase large quantities of product late in the calendar year. (*See* Chalk Dep. at 84). Normally, sales of pest control products are slow in December and January because there is little demand for the product. Bradley Chalk, a former marketing manager for FMC, testified at deposition that there was "intense" internal pressure within FMC to boost late-year sales. In order to induce sales, FMC began to offer incentives to purchasers. These incentives included (i) awarding a higher rebate for December purchases, compared to purchases made early in the year; (ii) allowing extended payment terms, rather than the standard ninety days; and (iii) crediting December purchases to both the current year and the next year for purposes of calculating the "core distributor rebate," thus essentially giving York double credit for its purchases. (*See* Chalk Dep. at 87–88).

In December 1996, York purchased a substantial amount of product from FMC. Eric Evans, then the Director of Specialty Products at FMC, encouraged York to make the purchase by stating that the December 1996 purchases would be recognized in both 1996 and 1997 for rebate purposes, thus giving York double credit. (*See* Chalk Dep. at 89).

In mid–1997, Evans again sought to induce York to purchase more FMC products. York accepted FMC's terms. A July 31, 1997 letter from Evans to York confirms that payment for these purchases was not due until December 31, 1997. (Pl. Mem.Opp.Sum.J.Ex. C.)

In December 1997, York again made a substantial purchase of FMC product. Evans told Craig Strobel, York's vice president, that his job at FMC was in jeopardy, and that FMC again needed to increase sales. (*See* Strobel Dep. at 98.) Strobel informed Evans that York had no need for additional product at that time, and would not be able to pay for it within the normal ninety day payment schedule. Nevertheless, in December 1997, York agreed to purchase an additional $1.6 million in FMC product. The terms under which York agreed to this purchase are at the core of this lawsuit. According to York, Strobel and Evans reached an oral agreement on the terms of the December

---

1. The parties do not specify when the business relationship between York and FMC began.

sale. There is, however, no written record of any contract, and FMC denies that any oral agreement existed.

FMC dismissed Evans in late–1997 and replaced him with Jim Collins. In early 1998, Collins outlined to Strobel the terms of the proposed 1998 FMC distributorship agreement. To Strobel's distress, the 1998 proposal was substantially different from the plan allegedly promised earlier by Evans.

On January 21, 1998, Collins and Strobel met to discuss the 1998 distributorship agreement. Strobel feared that the proposed agreement would place York at a financial disadvantage. The plan required York to purchase an amount equal to 20% of its 1997 purchases by March 31, 1998. The 20% was to be calculated based on a figure including the December 1997 purchases, thus substantially increasing York's required purchases for early 1998, at a time when its inventory was already large due to the December 1997 purchases. The plan also eliminated double credit for the December 1997 purchases and shortened the period under which York was required to pay in full for its December 1997 purchases. When Strobel protested that this plan departed significantly from the plan outlined by Evans in early December, Collins replied that he could not be held accountable for Mr. Evans's representations. (*See* Chalk Dep. at 128, Strobel Dep. at 159.)

The parties continued their negotiations through early 1998. During this time, York continued to sell FMC products and acted as an authorized distributor. In February, Collins met with Walter Tilley, president of Home Paramount. The meeting ended acrimoniously, without agreement. On February 26, Collins sent Tilley a letter, setting forth FMC's position as to York's status as an authorized FMC distributor in 1998. (*See* Def. Mem.Sup.Sum.J. Ex. A.) The letter stated that York could "continue to distribute

FMC products in 1998 but has not qualified for [FMC's] 1998 Distributor Rebate program. In lieu of a 1998 Distributor contract, this correspondence, from an FMC point of view, defines the 1998 marketing focus for the following areas for York." *Id.* York continued to sell FMC's products after receipt of the February 26 letter.

In May 1998, FMC shared York's customer list with representatives of Van Waters and Rogers, Inc. ("VW & R"), one of York's principal competitors. (*See* Chalk Dep. at 153.) York received an anonymous letter reporting the disclosure. (Pl. Mem.Opp.Sum.J.Ex. E.) Upon receipt of the letter, Strobel contacted Wendell Codner, FMC's sales representative. Codner told Strobel that York remained an authorized FMC distributor, and denied that FMC had distributed York's customer list. When Strobel pressed the issue of the customer list, Codner said he would get back to Strobel. Codner did not call Strobel again. Instead, Collins wrote Strobel, stating York had not been an authorized distributor since January 1998.

Home Paramount (under the name York Distributors) filed this suit against FMC in July 1998. The complaint has since been amended to name Home Paramount as the plaintiff.[2] The parties have undertaken extensive discovery. As amended, the complaint brings seven counts against FMC: (i) a declaratory judgment action seeking a declaration of the existence of a contract in 1998; (ii) breach of contract; (iii) negligent misrepresentation as to statements made prior to the December 1997 purchase; (iv) negligent misrepresentation as to the disclosure of the customer list; (v) misappropriation of trade secrets as to the disclosure of the customer list; (vi) conversion; and (vii) intentional interference with business relations. FMC has filed a counterclaim arguing breach of contract and seeking payment for the $1.6 million December 1997 purchases. FMC

2. *See* this Court's Order of March 20, 2000.

has moved for summary judgment on all counts and on its counterclaim.

## II. Summary Judgment Standard

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial). Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987).

## III. Analysis

### A. Breach of Contract and FMC's Counterclaim

*1. The December 1997 oral agreement between Evans and Strobel*

Defendant FMC argues that the terms of York's December 1997 purchases were governed entirely by the 1997 distributor agreement. Under this agreement, payment for any purchase was due within ninety days. The agreement contains no mention of crediting any December 1997 purchases towards 1998 accounts. FMC claims that York made heavy purchases in December 1997 in order to raise its total 1997 purchases to the "platinum level" and thereby obtain a larger core distributor rebate. According to FMC, the 1997 distributor agreement was the only governing

contract between the parties, and York is in breach of that contract because it has failed to pay for the $1.6 million in December 1997 purchases.

Plaintiff Home Paramount counters that Evans and Strobel reached an oral agreement in December 1997 concerning the additional purchases. This agreement was separate from the 1997 distributor agreement. Its terms included a promise that FMC would be switching to a "sales-based" program in 1998, thus ensuring double credit to York for its 1998 sales. According to Strobel, Evans also promised that York would not have to pay for its December 1997 purchases until December 1998. (*See* Strobel Dep. at 98–101.) In supposed reliance on these oral promises, York agreed to purchase $1.6 million of FMC's product and accepted delivery.

■ The Court finds that there is a dispute of material fact as to the terms under which York agreed to the $1.6 million purchase in December 1997. The history of the business relationship between FMC and York supports Strobel's deposition testimony that he and Evans reached an oral agreement. FMC had extended York favorable terms for heavy purchases late in the year both in 1995 and 1996. Bradley Chalk testified at deposition that FMC programs were often offered or modified verbally rather than in writing, and that these verbal modifications caused "significant complications." (*See* Chalk Dep. at 42, 46, 48–49.) The Court finds it therefore quite plausible that Strobel and Evans reached some kind of oral agreement in December 1997.[3]

■ FMC argues that any oral agreement between Evans and Strobel is not enforceable under the Statute of Frauds. The Court disagrees. Under Md.Code Ann., Com.Law. § 2–201(3)(c), an oral contract is enforceable if the goods have been received and accepted. In this case, there

---

**3.** *FMC's June 6, 2000 submission of excerpts from Evans's deposition does not shed light*
on the December 1997 negotiations.

is no dispute that York received and accepted the goods in question; indeed, FMC seeks payment for these goods in its counterclaim. The Statute of Frauds thus does not apply.

When the existence or terms of an oral contract is in dispute, the question is to be determined by the finder of fact. *See Globe Home Improvement Co. v. McCarty,* 204 Md. 513, 517, 105 A.2d 216, 218 (1954). The Court must therefore deny FMC's motion for summary judgment on the plaintiff's breach of contract claim.

The Court must likewise deny the defendant's motion for summary judgment on its counterclaim. The counterclaim essentially argues that even if Home Paramount is correct in asserting that an oral contracted existed, all payment was due by December 1998. As York took delivery of a substantial quantity of FMC's product in December 1997, Home Paramount does assuredly owe FMC payment of some amount. The plaintiff contends, however, that the oral contract included a provision under which York was to receive double credit for its December 1997 purchases. Home Paramount further alleges that FMC reneged on this promise. If Home Paramount's allegations are borne out, then Home Paramount could owe FMC significantly less than the amount sought by FMC in its counterclaim. Until the terms of any agreement between Evans and Strobel are known, the defendant cannot prevail on its counterclaim.

### 2. The February 26, 1998 letter

Home Paramount argues that the February 26, 1998 letter from Collins to Walter Tilley, President of Home Paramount, constitutes a binding contract under which York was to remain an authorized distributor throughout 1998. According to Home Paramount, FMC breached this contract in June 1998 when Collins informed Strobel that York had not been an authorized FMC distributor since January 1998.

FMC argues that the February 26 letter cannot constitute a contract. In FMC's view, the letter is at most a letter of intent during of negotiations between York and FMC. Under FMC's theory, such a letter cannot be enforced against FMC, because it is merely an expression of "tentative intentions" *See Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. Partnership,* 734 F.Supp. 1181, 1187 (D.Md.1990) (aff'd. 937 F.2d 603, 1991 WL 125666 (4th Cir. 1991) (table opinion)).

The *Phoenix* Court, following *Teachers Insurance and Annuity Assoc. v. Tribune Co.,* 670 F.Supp. 491 (S.D.N.Y. 1987), laid out a five-part test for determining whether a letter of intent can bind the parties. The Court is to consider: (i) the language of the agreement, (ii) the context of the negotiations, (iii) the existence of open terms, (iv) partial performance, and (v) the custom of such transactions. *See Phoenix,* 734 F.Supp. at 1187 (citing *Teachers,* 670 F.Supp. at 499–503).

In *Phoenix,* the Court found that no binding contract existed. FMC argues that the same conclusion follows here. The Court finds, however, that applying the *Phoenix* test to the facts in the instant case produces a different result.

Unlike the letter at issue in *Phoenix,* Collins's letter did not contain explicit language stating that the parties were not to be bound until an final agreement was signed. Instead, Collins's letter states that "in lieu of a 1998 Distributor contract, this correspondence from an FMC point of view, defines the 1998 marketing focus on the following areas for York. . . ." (Mot. Sum.J.Ex. A.)

The second prong of the *Phoenix* test involves the context of negotiations. In this case, after York received the February 26 letter, there were no further negotiations. York continued to distribute FMC product. The parties did not again discuss York's status as an authorized FMC distributor until May, when Strobel contacted Wendell Codner of FMC to discuss the

dissemination of York's customer list to VW & R. By contrast, in *Phoenix,* the parties continued negotiations after the signing of the letter of intent. *See* 734 F.Supp. at 1184.

Although final sentence of the letter holds open the possibility of further negotiations ("We continue to be willing to meet with you ... to resolve any remaining issues"), the substance of the letter does not indicate the existence of significant open terms. Instead, Collins, on behalf of FMC, states that he is "clarify[ing] any remaining issues regarding our path forward in 1998," and outlines FMC's "understanding" of the arrangement between York and FMC. The letter contains no significant open terms left for future negotiations.

The fourth prong of the *Phoenix* test, partial performance, further bolsters the finding of no open terms. The parties proceeded to operate under the terms outlined in the February 26 letter for over two months, until May 1998. York continued to distribute FMC product. Even in May, FMC's sales representative Wendell Codner told Strobel that York remained an authorized FMC distributor. Such a representation is inconsistent with the existence of open terms in the letter, and supports a finding of partial performance.

The defendant attaches great weight to the final prong of the test, the custom of such transactions. It cites as conclusive Chief Judge Harvey's observation in *Phoenix* that businesses "ordinarily do not enter into multi-million dollar transactions in the absence of a comprehensive writing." 734 F.Supp. at 1187–88. Although Chief Judge Harvey's is correct, the history of dealings between York and FMC cannot be characterized as ordinary. Both Chalk and Strobel testified at deposition that the parties had a history of oral agreements. Furthermore, Chalk testified it was possible for a company like York to be an authorized distributor and not participate in the rebate program. (See Chalk Dep. at 73). The Court finds, therefore, that

the February 26, 1998 letter from Collins to Tilley, in conjunction with the negotiations between the parties and subsequent performance by York, could be the basis for a contract between York/Home Paramount and FMC.

## B. Negligent Misrepresentation

Home Paramount contends that in late 1997 FMC negligently misrepresented the terms of its 1998 distributorship agreement in order to induce Home Paramount to make the $1.6 million in purchases December 1997. It also argues that Collins's February 26, 1998 letter further negligently misrepresents the details of the 1998 agreement.

■ Under Maryland law, a negligent misrepresentation claim has five elements: (i) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (ii) the defendant intends that his statement will be acted upon by the plaintiff; (iii) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (iv) the plaintiff, justifiably, takes action in reliance on the statement; and (v) the plaintiff suffers damage proximately caused by the defendant's negligence. *Weisman v. Connors,* 312 Md. 428, 444, 540 A.2d 783, 791 (1988) (citation omitted).

■ The Court finds that there is no claim for negligent misrepresentation as to the February 26, 1998 letter. Although FMC ultimately may not have adhered to the terms outlined in the letter, Home Paramount has produced no evidence to suggest that Collins knew, or should have known, that any of his statements were false. As discussed above, the letter may be the basis for a contract action, but it cannot give rise to a tort claim.

Likewise, any statements by Evans to Strobel in December 1997 concerning the nature of the 1998 Distributor Agreement cannot give rise to a claim for negligent misrepresentation. FMC may well have

owed York a duty of care during negotiations.[4] Home Paramount has not, however, produced any evidence that Evans meant to communicate FMC's intentions or expectations, but mistakenly or negligently failed to do so. *Cf. Weisman,* 312 Md. at 456, 540 A.2d 783. If, as Home Paramount contends, FMC's 1998 program was ultimately different from the program Evans and Strobel agreed to, Home Paramount's remedy lies in a contract claim, but not in tort. The Court will therefore grant summary judgment for the defendant on Home Paramount's negligent misrepresentation claims.[5]

## C. Trade Secrets

Home Paramount charges that by disseminating York's customer lists to competitors without permission, FMC is liable for misappropriation of trade secrets. FMC has provided the Court a copy of the information it transmitted to York's competitor, VW & R. (*See* Reply Mem. Ex. E, submitted under seal). The documents consist of the names, addresses, and phone numbers of various pest control companies, and includes the names of contact persons at many of the companies. The documents do not list the actual volume of sales, but indicate they represent York's top fifty customers in the Northeast and Southeast.

The central question for the Court is whether the information conveyed to VW & R constitutes a trade secret. As a preliminary matter, the Court will treat the claims as brought under the Maryland Uniform Trade Secrets Act ("MUTSA"), Md.Code.Ann.Com.Law II §§ 11–1201 – 11–1209, and not, as defendants urge, under common law.

The existence of a trade secret is a conclusion of law based upon the applicable facts. *See Operations Research Inc. v. Davidson & Talbird, Inc.,* 241 Md. 550, 556, 217 A.2d 375 (1966). Under MUTSA, a trade secret is defined as "information, including a ... compilation ..., that (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Md. Code Ann.Com.Law § 11–1201(e).

There is no question that a customer list can constitute a trade secret. *See, e.g., Dworkin v. Blumenthal,* 77 Md. App. 774, 781, 551 A.2d 947 (Md.App.1989). Although MUTSA statute preempts common law definitions of trade secrets, Maryland courts have continued to apply the Restatement of Torts's six-part test as "helpful guidance" in determining the existence of a trade secret. *Bond v. Polycycle, Inc.,* 127 Md.App. 365, 372–73, 732 A.2d 970 (Md.App.1999). The six factors are: (i) the extent to which the information is known outside of his [the employer's] business; (ii) the extent to which it is known by employees and others involved in his business; (iii) the extent of measures taken by him to guard the secrecy of the information; (iv) the value of the information to him and to his competitors; (v) the amount of effort or money expended by him in developing the information; and (vi) the ease or difficulty with which the information could be properly acquired or du-

---

4. FMC's reliance on *Martin Marietta Corp. v. INTELSAT,* 763 F.Supp. 1327 (D.Md.1991), is misplaced in this regard. *Martin Marietta* concerned a dispute subsequent to the parties having entered written contract. The case did not address the duties of parties engaged in pre-contractual negotiations.

5. FMC has moved for summary judgment on both Counts III and IV. In its opposition,

Home Paramount only contests summary judgment on Count III, which concerns the nature of the 1998 program. Count IV concerns the dissemination of sales data. Because there is no evidence supporting the plaintiff's allegation in Count IV, the Court will grant summary judgment for the defendant on Count IV as well.

plicated by others. *Id.* at 371, 732 A.2d 970 (citation omitted).

 The names and addresses of York's clients are obtainable through public sources such as a phone directory and trade associations. John Bolanos of VW & R testified as much at his deposition. (*See* Bolanos Dep. at 89 (under seal)). Although the volume of the customers' purchases is not so easily obtainable, FMC did not provide to any competitors actual quantities purchased. Rather, the documents include only a listing of York's top fifty customers.

The customer list is of obvious value to York. It is unclear, however, how valuable the information was to its competitors. Bolanos testified at deposition one of his district managers wanted to distribute the list to VW & R's sales staff, so as to provide information on FMC's sales in the region. (*See* Bolanos Dep. at 58.) On the other hand, Bolanos also agreed when asked by FMC's counsel that the information on the diskette he received from FMC was of little significance. (Bolanos Dep. at 89 (under seal)).

According to Strobel, York put substantial effort into compiling the information it provided to FMC. In Strobel's view, FMC's two percent payment to York represented an administrative fee in recognition of the time and effort involved in compiling the data. Putting aside the question of whether the two percent payment represented an administrative fee or a purchase of the information, the Court accepts that York expended a significant effort in compiling the Alliance data. An inspection of the actual information disseminated to VW & R, however, shows that FMC did not reveal to VW & R the most detailed information, such as including price and volume of each product sold, which was presumably the most tedious to assemble. Rather, FMC only revealed the names and addresses of the top fifty customers. Such information would be gathered as a matter of course as part of York's day-to-day operations.

Finally, there is the matter of secrecy. York has produced evidence showing that it went to significant lengths to ensure that its customer list and product purchase information were accessible only to a few employees. (*See* Strobel Aff., Pl. Opp.Mem. Ex. F). There is considerably less evidence to show that York had any sort of similar arrangement with FMC. Mr. Chalk testified at his deposition that to the best of his recollection, when the Alliance program was introduced in 1993, FMC staff made some assurances that sales data would not be shared among competitors. (*See* Chalk Dep. at 288–91). Home Paramount has produced no evidence demonstrating that the issue was discussed further after 1993, or that York and FMC ever entered into any formal confidentiality agreement.

On balance, the Court finds that the information contained in Exhibit E to FMC's Reply Memorandum cannot as a matter of law constitute a trade secret. The Court will therefore grant summary judgment for FMC on Count V. The Court will however deny FMC's request for attorney's fees under Md.Code Ann.Comm. Law § 11–1204(1), because the claim raised legitimate questions of law, and there is no evidence that the claim was brought in bad faith.

### D. Conversion

 Count VI of the complaint charges that FMC converted York's alliance sales data by disclosing it to VW & R. Under Maryland law, conversion requires "the exercise of unauthorized dominion and control to the complete exclusion of the rightful possessor." *Yost v. Early,* 87 Md.App. 364, 388, 589 A.2d 1291 (Md.App. 1991). Regardless of the propriety of FMC's sharing the Alliance data with VW & R, Home Paramount has not produced any evidence to show that it was denied access to the Alliance data. The Court will therefore grant summary judgment for FMC on Count VI.

### E. Intentional Interference with Business Relations

█ Count VII charges FMC with intentional interference with business relations. Under Maryland law, tortious interference with business relations requires that "a third party, without justification and for an unlawful purpose, intentionally interfered with the business relationship between the plaintiff and another, causing the plaintiff actual damage." *Beall v. Abbott Laboratories*, 130 F.3d 614, 621 (4th Cir.1997).

█ Home Paramount's theory posits that in 1998, when FMC informed York's clients that York was no longer an authorized FMC distributor, FMC committed tortious interference. Home Paramount has not, however, produced any evidence of communications between FMC and York's clients made for an unlawful purpose, nor has it produced any evidence of damages suffered. As discussed earlier, if FMC did indeed breach a 1998 agreement, Home Paramount may recover contract damages from FMC. The Court will, however, grant summary judgment for FMC on Count VII.

### F. Declaratory Judgment

Home Paramount states that it is withdrawing its request for a declaratory judgment. The Court will therefore dismiss Count I.

### IV. Conclusion

For the foregoing reasons, the Court shall, by separate Order, grant the defendant's motion for summary judgment on Counts III, IV, V, VI, and VII of the third amended complaint, dismiss Count I of the third amended complaint, deny the defendant's motion for summary judgment on Count II of the third amended complaint, and deny the defendant's motion for summary judgment on its counterclaim.