**NATURALAWN OF AMERICA, INC., Plaintiff**

v.

**WEST GROUP, LLC, et al., Defendants.**

**CIV. No. AMD 06–3325.**

United States District Court, D. Maryland.

April 22, 2007.

Karen Ann Doner, Williams Mullen Clark and Dobbins, Thomas John McKee, Jr., Williams Mullen PC, McLean, VA, for Plaintiff.

Melissa L. Bernheim, Robert M. Einhorn, Zarco Einhorn Salkowski and Brito PA, Miami, FL, Timothy M. Monahan, Offit Kurman PA, Maple Lawn, MD, for Defendants.

## MEMORANDUM OPINION and ORDER

DAVIS, District Judge.

Plaintiff NaturaLawn of America, Inc. (NLA), is a national franchisor of organic-based lawn care services. Defendants are former franchisees of NLA, West Group, LLC, and West Group II, LLC, and the principals and managers of those entities, Stephen Fiala, Wendy Fiala, Leo Wiener, James Swanton, and Gregory Curtain. Plaintiff brings claims under the Lanham Act, 15 U.S.C. § 1125(a), the Maryland Uniform Trade Secrets Act (MUTSA), Md. Code Ann., Com. Law § 11–1201 *et. seq.* (2006), and Maryland common law, alleg-

ing, *inter alia*, trademark infringement, misappropriation of trade secrets, and breach of contract.

Plaintiff filed a motion for preliminary injunction to enjoin defendants from: (1) infringing NLA's trademark; (2) disclosing and/or using NLA's trade secrets; (3) and continuing their on-going breach of the parties' contracts by competing against NLA, using NLA's trade secrets, and advertising or otherwise using NLA's trade name. The motion has been fully briefed and a hearing was held on April 18, 2007, during which counsel were fully heard and the evidence was considered. For the reasons stated on the record during and at the conclusion of the hearing, and as further elaborated in the following findings of fact and conclusions of law, the motion for preliminary injunction shall be granted.

## I.

. NLA is a national franchisor of landscape and lawn care services (the "NLA System"). NLA entered into three Franchise Agreements with defendants, granting defendants an exclusive right and license to operate NLA-franchised businesses in Somerset County, Mercer County, and Essex County, New Jersey.[1] The agreements were signed on or about October 30, 2001, for a five-year term. Each Franchise Agreement was substantially identical and is expressly entered into under, and is to be interpreted under, Maryland law. *See Franchise Agreements § 30.A.*

In 2004, defendants became aware of a provision in a 2001 New Jersey law that, according to defendants and as described in detail below, suggested the marketing and advertising of the NLA system might be illegal. The applicable provision, *inter alia*, prohibits advertising in a manner that would indicate that the use of a pesticide is safe, sanctioned, or approved by the Environmental Protection Agency. *See* N.J. Admin. Code § 7:30–2.12. Plaintiff's name, advertising and marketing material state that its products are "organic-based," "safe," and "natural." Defendants assert that, based on their discovery of this law, and after receiving legal advice, they decided not to renew the Franchise Agreements and allowed them expire in late 2006.[2]

The Franchise Agreements contain strict non-compete provisions, which provide as follows:

Franchisee and each of the Controlling Principals, for a period of twenty-four (24) months after termination of this Agreement for any reason (or the date such person ceases to be a Controlling Principal), whether directly or indirectly, shall not engage in or acquire any financial or beneficial interest, including, without limitation, any interest in corporations, partnerships, trusts, incorporated associations or joint ventures, in, assist or become a landlord of any lawn care or landscaping business, which is similar to the Business operated by Franchisee or Controlling Principal (as applicable), within the Licensed Territory or within the licensed territory of any [NLA] franchisee or within a twenty (20) mile radius of the perimeter of the Licensed Territory or any licensed territory of any [NLA] Business, whether such [NLA] Business is operated by another franchisee of Franchisor or by Franchisor, or a subsidiary or affiliate of Franchisor.

---

1. Stephen Fiala, Wendy Fiala, and West Group were the Franchisees in Somerset County; Stephen Fiala and West Group were the Franchisees in Mercer County; and Ste-

phen Fiala, Leo Wiener, and West Group II were the Franchisees in Essex County.

2. Defendants informed plaintiff of their decision in a letter dated November 10, 2006.

*See Franchise Agreements § 11.B.* In addition, there is an Attachment D (entitled "Covenants Not to Compete") to each Franchise Agreement. Under Attachment D, any so-called "Covenantor" agrees that for two years after the termination or expiration of the Franchise Agreement or the termination a Covenantor's employment by or association with the Franchisee, the Covenantor will not without written consent engage in any of the activities described in the non-compete clause described above. *See id. at Attachment D.*

The Franchise Agreements also provide that defendants "shall not appropriate, use or duplicate the [NLA] System, or any portion thereof, for use at any other lawn care, landscaping or other business." *See Franchise Agreements § 11. C.* The Franchise Agreements also prohibit the use and/or disclosure of any confidential information or trade secrets, *id. at Attachment D,* as well as "any trade name, service mark, copyright, trademark, or other intellectual property similar to or likely to be confused with those of [NLA]." *See id. at § 20.B.* The Franchise Agreements also required defendants to turn over all customer lists to NLA upon termination or expiration of the Franchise Agreements and provided specifically that "all customers are the property of the [NLA]." *Id. at § 20.* Finally, the Franchise Agreements afforded NLA the opportunity to purchase the defendants' business upon "termination or expiration" of the franchise relationship. *Id. at § 16.*

It is undisputed that defendants are currently operating a lawn care business, under the name "Jersey Green," in direct competition with plaintiff.[3] This business is substantially identical to the NLA System and provides identical services in di-

rect competition with NLA within the counties that were subject to the Franchise Agreements. Defendants Swanton and Curtain are the Manager and Sales Manager, respectively, of the new business and were not parties to the Franchise Agreements.

Plaintiff alleges, and has amply proven by clear and convincing evidence, that defendants are using NLA's confidential information and trade secrets in their operation of Jersey Green. Plaintiff also alleges, and has proven by clear and convincing evidence, that in the operation of Jersey Green, defendants are infringing on NLA's trademark, are passing themselves off as affiliated with NLA, and plainly are confusing former customers and potential customers of NLA as to the source of the services being provided.

Specifically, defendants have willfully solicited and diverted NLA's customers to Jersey Green. *Indeed, it was established at the hearing that virtually all of Jersey Green's customers are former NLA customers who were serviced by defendants prior to the expiration of the Franchise Agreements.* This is not surprising, inasmuch as it is undisputed that, within a week or so of the expiration of the Franchise Agreements in October 2006, defendants provided written notice to customers that the Jersey Green business was simply a "name change." *See Plaintiff's Exh. 9 (Geiger Affidavit).* Moreover, in December 2006, defendants notified NLA's customers that NLA might not be able legally to provide lawn care services in New Jersey and urged such customers not to make any payments to NLA. *See Plaintiff's Exh. 11. At the same time, defendants have continued to accept payments from former*

---

**3.** In fact, during the present Spring season, defendants are not "competing with" NLA because defendants' actions have made it impossible for NLA to retain a successor franchisee in the covered territories. Thus, defendants' actions have effectively ousted NLA from the covered territories.

*NLA customers, and, indeed, to negotiate checks made payable to NLA. See Plaintiff's Exhs. 7 (Ruhnke Affidavit), 8 (Catron Affidavit), 9 (Geiger Affidavit); 33.*

In sum, defendants' inexcusable behavior presents as blatant and unjustified a repudiation of subsisting contractual obligations in a commercial context as has been known to or encountered by this court.

## II.

■ Before a court may issue a preliminary injunction, the court must weigh and evaluate the evidence to assess four interrelated factors, namely: (1) the likelihood that the plaintiff will succeed on the merits; (2) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (3) the likelihood of irreparable harm to the defendant if the requested relief is granted; and (4) the public interest. *See Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991); *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189, 195 (4th Cir.1977). Application of controlling Fourth Circuit precedent here compels the conclusion that the court should grant the motion for preliminary injunction.

## A.

### 1.

■ Plaintiff has demonstrated an extraordinarily strong likelihood of success on the merits with regard to at least some, if not all, of its claims. The first count is brought under the Lanham Act, which prohibits trademark infringement and unfair competition. In order to prevail on such a claim, a plaintiff must show that "it has a valid, protectable trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Motor City Bagels, L.L.C. v. The American Bagel Co.,* 50 F.Supp.2d 460, 485 (D.Md.1999); *see generally Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922, 930 (4th Cir.1995).

■ NLA has a valid trademark. *See Plaintiff's Exh. 1.* There are various "imitations" alleged by the plaintiff, that, if proven, would lead to confusion by consumers. In particular, defendants have used a fertilizer tractor that displays a large "NaturaLawn of America" logo on its side. Manifestly, as described above, not simply *likely confusion,* but *actual confusion,* over plaintiff's mark and source of services has been demonstrated. *See Merry Maids, L.P. v. Kamara,* 33 F.Supp.2d 443, 445 (D.Md.1998).[4] Moreover, defendants' assertion to NLA's customers that those customers are being serviced by the same entity which has simply *changed its name* can only generate confusion among customers, especially when coupled with the undisputed fact that defendants have informed plaintiff's customers that NLA's services are "illegal" in New Jersey.

■ Plaintiff also brings a count under the Maryland Uniform Trade Secrets Act. The statute provides, *inter alia,* for an award of injunctive relief in response to the misappropriation of trade secrets. Md.Code Ann., Com. Law 11–1202(a); *see LeJeune v. Coin Acceptors, Inc.,* 381 Md. 288, 315, 849 A.2d 451 (2004). The statute defines "trade secret" as information that (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other per-

4. Under the Franchise Agreements, the phone numbers should have been transferred to NLA. As of the time of the preliminary injunction hearing, the phone numbers, including the one listed in the phone book as NLA, were still being answered as "Jersey Green." *See Plaintiff's Exhs. 19, 28.*

sons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Md.Code Ann., Com. Law 11–1201(e).

Here, defendants have misappropriated plaintiff's trade secrets by using NLA's specially designed computer software, both to utilize products and in order to gain customer lists. Defendants argue that the software is not a trade secret; I disagree. Although the software is publicly available in its basic form, the specific software at issue here is customized, enhanced, and unique to NLA's franchise. *See Plaintiff's Exhs. 13 (2nd Catron Affidavit), 20.*

 Defendants also argue that customer lists are not trade secrets. But application of the test employed in case law contradicts this contention. *Home Paramount Pest Control Co., Inc. v. FMC Corp.*, 107 F.Supp.2d 684 (D.Md.2000). In *Home Paramount*, the court noted that despite the existence of MUTSA, the six part test of the Restatement of Torts has continued to be applied in defining trade secrets. *Id.* at 692 *(citing Bond v. Poly-Cycle, Inc.*, 127 Md.App. 365, 372–73, 732 A.2d 970 (1999)). That test requires the court to consider: (1) the extent to which the information is known outside of [the employer's] business; (2) the extent to which it is known by employees and others involved in [the employer's] business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and [the employer's] com-

petitors, (5) the amount of effort or money expended by [the employer] in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id.* at 693.

It is clear that the identity of NLA's customer is not widely known outside NLA and that the lists of those customers *are* well known among NLA employees and franchisees. Here, the customer lists and how they are maintained have been carefully guarded. The Franchise Agreements specifically provided for their return upon the termination of the franchise relationship. *See Franchise Agreements § 20.* These data were so important precisely because the customer list would be so valuable to a former franchisee that undertook to became a competitor.

Plaintiff has developed these lists over time. It clearly takes effort (establishing goodwill) and money (advertising) to establish any customer base. Therefore, plaintiff's customer lists are trade secrets. In sum, the relevant intellectual property, customer lists, and software belong to NLA and defendants have misappropriated and made wrongful use of these assets.

 Plaintiff also has a strong breach of contract claim for breach of the Franchise Agreements' non-compete provisions and the related Attachment Ds, and NLA's right-to-purchase.[5] The non-compete provisions of the Franchise Agreements are enforceable under Maryland law if they are reasonable in scope, time, and geo-

---

**5.** Defendants make a passing reference to the alleged unfairness of the right-to-purchase provision. To be sure, the right-to-purchase provision may or may not be subject to a challenge as unconscionable or otherwise, but what is most telling here is that defendants abjured that provision every bit as much as they did the other provisions in the Franchise Agreements. Thus, the court is not called upon to render an informed decision on that

issue. What is undeniable, however, is that, like all contracts subject to Maryland law, an implied covenant of good faith is applicable. *See, e.g., Parker v. The Columbia Bank*, 91 Md.App. 346, 366, 604 A.2d 521, *cert. denied*, 327 Md. 524, 610 A.2d 796 (1992)(An implied duty of good faith "prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract.").

**400**

graphical limitations. *Merry Maids,* 33 F.Supp.2d at 443. Here, the defendants voluntarily agreed not to operate a lawn care service in the counties covered by the Franchise Agreements for two years after the "termination" of the contract. The scope of this prohibition is reasonable (and defendants do not earnestly contend otherwise) because it is the same type of business that the defendants operated as franchisees. Likewise, the geographic scope is reasonable inasmuch as it is limited to the areas where the Franchise Agreements were in effect (and any nearby service areas of other NLA franchisees). Finally, a term of two years is a reasonable time period for the restriction under Maryland law. *Budget Rent a Car, Inc. v. Raab,* 268 Md. 478, 482, 302 A.2d 11 (1973) (finding a two-year post-term covenant not-to-compete in franchise agreement reasonable).

2.

■ Defendants' defenses to plaintiff's claims and their opposition to the motion for preliminary injunctive relief are based on legal arguments rather than factual arguments related to the reasonableness *vel non* of the non-compete provisions. First, defendants argue that the Franchise Agreements are void *ab initio* because contracts that violate statutes will not be enforced. *Queen v. Agger,* 287 Md. 342, 346, 412 A.2d 733 (1980). They contend, in other words, that the operation of an NLA franchise violates New Jersey law. This contention is deeply misguided. The court is not remotely convinced that New Jersey law is violated by NLA's business model.

To begin with, the New Jersey provision at issue, which has been in effect for more than five years, has not been found to have been violated.[6] Defendants have cited no case in which the type of lawn services companies at issue have been fined, shut down, or otherwise charged with a violation. Plaintiff has never been told by the New Jersey Department of Environmental Protection (the Department) that its name, advertising slogans or marketing materials violate New Jersey law.[7] *See Plaintiff's Exh. 13 (2nd Catron Affidavit).* The code provision at issue is intended to protect consumers from misleading information about *pesticide poisoning,* not *all lawn care services.*

Moreover, even if state law could be violated by the NLA system, it was the defendants' obligation, under the Franchise Agreements, *see Franchise Agreements §§ 5, 12.H,* to ensure compliance with New Jersey law. To void the Franchise Agreements based on defendants' failure to comply with them would be a curious, if not unjust, result.

Furthermore, assuming there was an "illegal purpose" in the Franchise Agreement, Section 29 of the Franchise Agreements contains a severability provision. *See Franchise Agreements § 29.* Those portions of the contract that might be found "illegal" are severable and do not void the Franchise Agreements in their entirety. Therefore, the non-compete provisions and NLA's right to purchase defendants' business remain valid and enforceable.

6. Defendants have not even attempted to offer a plausible explanation as to why they continued to operate as NLA franchisees for more than two years if they genuinely believed that doing so violated state law. As plaintiff contends, defendants' invocation of the illegality doctrine appears to be nothing more than a *post hoc* rationalization for defendants' violations of their contractual undertakings enabled by an imperfect (and belated) "advise of counsel" assertion.

7. Indeed, there has been no response from the New Jersey Department of the Environment to defendants' November 2006 letter calling the authorities' attention to NLA's alleged violation of state law. The State of New Jersey clearly does not perceive a violation of state law by NLA.

Defendants also argue that the non-compete provisions should not be enforced because they are operable only upon a "termination" of the Franchise Agreements and not where, as here, the Franchise Agreements have ended by their "expiration." This argument is rejected as a matter of fact and of law. Under Maryland law, the terms in a contract are interpreted using their plain and ordinary meaning. *See Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194 (2001). An "expiration" of an agreement is a more specific type of "termination." The fact that both words appear in other provisions of the Franchise Agreements does not undercut this conclusion. Indeed, the Franchise Agreements provide that the non-compete clause would apply after termination *"for any reason."* *See Franchise Agreements § 11.B* (emphasis added). Clearly, "expiration" is one reason for the "termination" of an agreement. There is no substantial reason identified by defendants why a court would bend over backwards to distort the plain meaning of these everyday terms in order to find an ambiguity in the Franchise Agreements so that the agreements might be "interpreted" against NLA as the drafter of the agreements.

Defendants also argue that Attachment D is not applicable to them as they never executed Attachment D as a "Covenantor" but only as a "Franchisee." They contend that Attachment D was intended to apply only to *employees* of the franchisees. This argument borders on the frivolous and is rejected. The non-compete provision of Attachment D, by its very terms, binds all "officers, directors, and interest holders of the franchisee," *see Franchise Agreements, Attachment D, and requires the franchisee to use its best efforts to enforce it.* It would do violence to common sense and settled legal principles to conclude that the principals of the franchisees, clearly "officers, directors and interest holders," are not bound by the non-compete provision reiterated in Attachment D.

As seen, therefore, defendants' legal arguments in defense of the enforceability of the Franchise Agreements and of the non-compete provisions are unavailing. NLA is all but certain to prevail when this case is finally heard on the merits.

B.

The second factor to consider in determinating whether to grant a preliminary injunction is whether there will be irreparable harm to the plaintiff if the injunctive relief is not granted. Plainly, that is the case here. Violation of a trademark is a claim especially suited to injunctive relief because it can result in irreparable harm where there is an inherent injury to the goodwill and reputation of the plaintiff. *See Merry Maids*, 33 F.Supp.2d at 445. Likewise, defendants' use of plaintiff's trade secrets constitutes irreparable harm because they have used and continue to use that proprietary information to gain NLA customers and, effectively, to shut down plaintiff's operations entirely. *See supra* n. 3.

The defendants' breach of contract inflicts similar irreparable harm. Defendants have blatantly ignored the non-compete provisions of its agreement with NLA in directly competing with the plaintiff and utilizing NLA's proprietary information. NLA is attempting to find new franchisees for defendants' former territories. *See Plaintiff's Exh. 8 (Catron Affidavit).* If defendants are allowed to continue their current course of action, plaintiff and its new franchisees (if plaintiff is even able to obtain any, which is highly unlikely) are and will be permanently harmed. *Cf. ATL Int'l, Inc. v. Baradar,* Bus. Franchise Guide (CCH) 11, 345

(D.Md.1997)(Motz, J.)(oral ruling, not officially reported)(finding irreparable harm if a "breakaway" franchisee were allowed to continue operating in violation of a non-compete clause, because it would send a signal to other disgruntled franchisees, would damage the franchisor's goodwill, and could unravel the entire franchise system).

Defendants' assertions that none of these harms is irreparable, immediate, or certain are unconvincing. It is perfectly obvious that if the defendants are not enjoined, plaintiff will be permanently damaged and permanently shut out of the market in the counties at issue because few if any prospective franchisees will agree to step into the relevant market. Plaintiff has already lost customers as a result of defendants' activity and there is no reason to think this will stop as long as the status quo remains. The speculative availability of an ephemeral damages remedy for defendants's violations is little more than a hope (and a thin one, indeed) on this record.

## C.

■ The final two criteria for preliminary injunctive relief, a balancing of harms and assessment of the public interest, also weigh heavily in favor of a grant of preliminary injunctive relief. Of course, at first blush, the balance of harms arguably favors defendants. Defendants will be greatly burdened if forced to shut down their business altogether during the pen-

dency of this case. They have invested heavily in it and have debt service to retire. On the other side, plaintiff's business opportunities in the counties at issue are being seriously curtailed, if not shut down completely, which constitutes irreparable harm, as discussed above, and that harm worsens with every passing day. Plainly, however, plaintiff will not shut down all operations on a nationwide basis.

■ Nevertheless, defendants' hardships have been created by their own willful acts. This is a factor that the court is entitled to consider. Defendants could have continued to operate their business as a franchisee of NLA. They also could have sought clarification, e.g., through an action for declaratory judgment, as to the legality of operating an NLA franchise in New Jersey, if indeed that was their true motivation for repudiating the Franchise Agreements. At the very least, they could have entered into negotiations to sell their businesses to NLA (probably while still operating the businesses) as the Franchise Agreements provided. *See supra* n. 5. Instead, they chose to ignore altogether their obligations under the Franchise Agreements and, instead, to move forward with a competing business, thereby "rolling the dice" that injunctive judicial relief would permit them to continue their evident wrongdoing during the pendency of the case. They cannot now avoid enforceable agreements because they will be harmed as shown here, harm that is self-inflicted.[8]

---

8. Some courts have heavily discounted such "self-inflicted" harms in their evaluation of the balance of harms analysis. *See Jiffy Lube Int'l v. Weiss Bros.*, 834 F.Supp. 683, 693 (D.N.J.1993)("To the extent that the defendants suffer significant, and in a sense irreparable, damage from the granting of the preliminary injunction, this harm is a predictable consequence of their willful breach of contract and their misconduct. As such, it is not the type of harm from which we seek to protect a defendant. While a court fashioning an equitable remedy should not impose hardship on a defendant which exceeds that required to protect a plaintiff's legitimate contractual interests, the often painful harm which follows a defendant who willfully breaches a contractual undertaking is not a basis for denying a plaintiff the relief to which it is legally entitled.") (granting preliminary injunction); *Manufacturer Direct, LLC v. DirectBuy, Inc.*, 2006 WL 319254, *7 (N.D.Ind., Feb. 10, 2006)(denying preliminary injunction

sought by plaintiff/franchisee because, in part, the harm to plaintiff was "a predictable consequence of [plaintiff's] likely breach of the Franchise Agreement").

In contrast, the Fourth Circuit has cautioned district courts not to give "short shrift" to the harm to defendants against whom a preliminary injunction is sought on the ground that the harm is "self-inflicted:"

> We agree with the defendants that the district court gave impermissibly short shrift to the question of the harm that would be visited upon the defendants. The harm to a defendant, particularly a defendant in a false advertising case, could almost always be described as of the defendant's own making. If self-made harm is given substantially less weight, as it was by the district court in this case, then the balance of the harms will almost always favor the plaintiff, thus transforming a preliminary injunction from an extraordinary remedy into a routine occurrence. And when the purpose behind the requirement that the court balance the harms is recognized, it becomes apparent that it is error to dismiss as self-inflicted the harms that might be suffered by a defendant if an injunction were to issue.
>
> "[G]ranting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way. 'The danger of a mistake in this setting is substantial.'" Hughes Network Sys., Inc. v. InterDigital Communications Corp., 17 F.3d 691, 693 (4th Cir.1994) (internal alteration omitted) (quoting American Hosp. Supply Corp. v. Hospital Prods. Ltd., 780 F.2d 589, 593 (7th Cir.1986)). The entire preliminary injunction inquiry, and particularly the requirement that the district court carefully balance the harms to the parties, is intended to ensure that the district court "choose[s] the course of action that will minimize the costs of being mistaken." American Hosp. Supply Corp. 780 F.2d at 593 (7th Cir.1986). Thus, while cases frequently speak in the short-hand of considering the harm to the plaintiff if the injunction is denied and the harm to the defendant if the injunction is granted, the real issue in this regard is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly granted or denied:
>
> > If the judge grants the preliminary injunction to a plaintiff who it later turns out

is not entitled to any judicial relief-whose legal rights have not been violated-the judge commits a mistake whose gravity is measured by the irreparable harm, if any, that the injunction causes to the defendant while it is in effect. If the judge denies the preliminary injunction to a plaintiff who it later turns out is entitled to judicial relief, the judge *285 commits a mistake whose gravity is measured by the irreparable harm, if any, that the denial of the preliminary injunction does to the plaintiff.

American Hospital Supply Corp., 780 F.2d at 593. By dismissing outright or giving less weight to the harm that would be suffered by a defendant on the grounds that the harm was self-inflicted, a court is effectively considering the harms that would flow from a *properly entered* injunction (that is, an injunction entered against a defendant who would go on to lose) rather than considering the harms that would flow from an injunction entered in error (an injunction entered against a defendant who would go on to win). We therefore believe that it is error for a district court to conclude that any harm that would be suffered by a defendant was self-inflicted and thus entitled to lesser weight in the balancing-of-the-harms portion of the preliminary injunction calculus.

Scotts Co. v. United Industries Corp., 315 F.3d 264, 284–85 (4th Cir.2002).

In the case at bar, my use of the term "self-inflicted" does not signal that I am giving the harm to the defendants "short shrift" or that I am "giving less weight to the harm that would be suffered by a defendant." Rather, I am describing the reality of the source and character of the harm that undoubtedly will befall defendants by the preliminary injunction. Nevertheless, the record makes plain that either plaintiff (through some other franchisee, if plaintiff can recruit one) or defendants (as they are presently) will service the book of business that defendants misappropriated from plaintiff, but not both. If the balance of hardships tips in favor of defendants, it does so only by a minuscule margin. Plaintiff's likelihood of success entirely overcomes any marginally greater harm to defendants suggested by this record.

This approach is especially appropriate in this case inasmuch I do not believe I am acting on a seriously "incomplete record." *Id.* As discussed in the text, the defenses offered up by defendants are legal defenses, not factual defenses. Therefore, the record as to defendants' defenses on the merits of this case

 Granting the preliminary injunction is also in the public interest. Defendants purposely entered into a course of action, based on thin legal arguments, that sought to avoid contractual obligations. It is in the public interest to repudiate this type of activity and enforce valid contracts. It is also in the public's interest to validate the interests of mark owners and the proprietary nature of trade secrets.

## III.

The record presents a compelling case for a preliminary injunction. Plaintiff is certain to win its claims under the MUT-SA, the Lanham Act, and for breach of contract. Plaintiff will continue to suffer largely incalculable irreparable harm if defendants' business continues to operate free of the reasonable constraints to which defendants voluntarily bound themselves in the Franchise Agreements. The harm to the defendants is substantial, but, in the final analysis, does not outweigh that visited by defendants' acts and omissions on plaintiff. Finally, the public interest strongly favors the preliminary injunction.

In conclusion, because the balancing of all the applicable factors militates strongly in favor of granting injunctive relief, plaintiff's motion for preliminary injunction is GRANTED and the motion to stay pending appeal is DENIED.[9] An Order follows.

is essentially complete and whatever risk of error there is here is not increased by a failure to afford defendants an opportunity to develop fully any evidence bearing on factual disputes.

9. Defendants have filed a motion to stay, which has been read and considered. None

of the defendants' arguments in favor of a stay, which largely echo their arguments presented in their written and oral presentations, are persuasive. Nonetheless, the court will not require defendants to notify their customers of these proceedings and will leave that task to plaintiff.